Filed 7/9/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S048440 |
| v. | ) | |
| | ) | |
| CHRISTOPHER CHARLES LIGHTSEY, | ) | |
| | ) | Kern County |
| Defendant and Appellant. | ) | Super. Ct. No. 56801A |
| _____ | ) | |

A jury in Kern County Superior Court convicted defendant Christopher Charles Lightsey in 1995 of the first degree murder of William Compton (Pen. Code, § 187)[1] and of burglary (§§ 459, 460, subd. (a)) and robbery (§§ 211, 212.5, subd. (a)) related to the murder.[2]  As to each count, the jury found true the allegations that defendant personally used a deadly weapon in committing the offense (§ 12022, subd. (b)(1)) and that he had served a prior prison term (§ 667.5, subd. (b)).  In conjunction with the murder verdict, the jury found true three special circumstance allegations:  that the murder was committed in the course of a burglary and a robbery (§ 190.2, subd. (a)(17)(A), (G)), and the murder was

_____

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    Before trial, defendant also pleaded nolo contendere to being a felon in possession of a firearm (§ 12021.1, subd. (a)) and admitted a prior-prison-term sentence-enhancement allegation (§ 667.5, subd. (b)).

intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)).  The jury

returned a verdict of death, and the trial court, after denying defendant's motion

for a new trial and the automatic application to modify the verdict (§ 190.4,

subd. (e)), sentenced defendant to death.[3]  This appeal is automatic.  (§ 1239,

subd. (b).)  As discussed in part I.B.1.b., *post*, we conclude the trial court

committed reversible error by permitting defendant to represent himself during

proceedings to determine whether he was mentally competent to stand trial.  To

remedy this error, we remand the case for further proceedings to allow the trial

court to determine whether a retrospective evaluation of defendant's competence

to stand trial is feasible and, if it is, to hold such a hearing.  If the trial court

determines such a hearing is not feasible or defendant was incompetent, defendant

is entitled to a new trial.

## I.  GUILT PHASE

### A.  Facts

#### 1.  *Prosecution Evidence*

William Compton, 76 years old at the time of the murder, lived alone in his

house on Holtby Road in Bakersfield.  Compton was an avid ham radio operator

and collector of firearms.  He owned an extensive collection of handguns and

rifles, as well as equipment and materials related to the firearms, such as

ammunition and maintenance supplies, all of which he stored in his house.  He

kept in a notebook a record of the various firearms he had purchased and sold over

the years.  His radio equipment was set up in one room of his house, and his motor

home, which was parked in front of his house, contained more radio equipment.

---

[3]     The court stayed the sentences on the remaining counts pursuant to section
654.

2

Compton had been diagnosed with colon cancer that had metastasized to other parts of his body. He had started a course of radiation treatment a few days before the murder and had an appointment for his fourth session at 11:30 a.m. on July 7, 1993. The medical office where Compton received his treatments was located a 10-minute drive from his house, and on his previous three appointments he had arrived approximately 15 minutes before his appointment's scheduled time. Compton did not, however, make it to his appointment on July 7. A neighbor had seen him in his backyard at approximately 7:45 that morning. About 9:30 a.m., another neighbor saw a person she thought was Compton walking in the driveway in front of the house. The man was wearing khaki pants like those the first neighbor described Compton as wearing. Two of Compton's friends telephoned him on four occasions that day, but he did not answer any of the calls. The calls were made at approximately 8:01 a.m., 8:49 a.m., 11:05 a.m., and 1:35 p.m. George Miller, the friend who had made three of the calls, including the final one, eventually called the medical office where Compton had his appointments and learned that Compton had not arrived for his treatment. Miller, his wife, and the other friend who had called Compton that day then went to his house to check on him. The doors of the house were locked, and their knocking received no response. On looking through a bedroom window, Miller's wife saw Compton's body on the floor. The trio called 911, and the firefighters who responded to the scene forced open a window and confirmed that Compton was dead. It was very hot inside the house, and Compton's body, which was lying faceup on the floor and clothed only in underwear, was stiff with rigor mortis. There were wounds to Compton's torso, but their exact nature and number was not clear due to the blood on the body.

The police officers who responded determined that, other than where the firefighters had entered, the house bore no sign of forced entry nor were there any

3

obvious signs that any property had been removed. Still in the house were a pair of pants containing Compton's wallet hanging on the towel rack in the bathroom, Compton's ham radio equipment, tools, a television, a videocassette player, and a rifle. The police officers and coroner's assistant at the scene theorized that Compton may have committed suicide, based on information concerning his serious medical condition and the circumstances that Compton's body bore what appeared to be superficial, "hesitation wounds," his body had not been moved after his death, and there were no obvious indications that a robbery had occurred.

Based on the initial uncertainty regarding the nature of Compton's death and the possibility it might have been a suicide, the police did not conduct a full forensic examination of the house and instead departed after sealing it. An employee of the coroner's office notified Compton's sister-in-law, Margaret Compton, of his death. The following day, July 8, 1993, Margaret went to the coroner's office to obtain the keys to Compton's house and vehicles. The coroner's assistant advised Margaret that she should secure Compton's belongings and vehicles before potential burglars learned of his death. She and her son Anthony then went to the house and removed a number of items, including five firearms, a ceremonial sword, a telephone answering machine, a television, a videocassette recorder, a computer, a ham radio, locksmith equipment, and a number of power tools. They also took the notebook that contained Compton's records of the firearms he had bought and sold, and two empty video camera boxes.[4]

The coroner conducted an autopsy of Compton's body on July 9, 1993. Once the blood had been washed off the body and the full extent of Compton's

---

[4]    The cameras were not in the house.

4

wounds became apparent, that his death was a homicide and not a suicide was clear. There were 42 stab wounds grouped in three clusters in the front of his abdomen, on his neck and upper chest, and on his face, and one more stab wound in his right armpit. Two of the wounds in the chest had penetrated his heart, and the wounds to his neck had severed his left jugular vein and left carotid artery. As a result of the wounds to his heart and carotid artery, Compton would have lost consciousness and then bled to death within 15 minutes. The wounds appeared to have been inflicted more or less contemporaneously by a single object approximately a half-inch wide and at least five inches long. The object might have been a letter opener, a screwdriver, or a nonserrated metal file. The infliction of these wounds would have caused "extreme physical pain and suffering." There also were some superficial abrasions and bruising on his forehead, face, and chin that appeared to be slightly older than the stab wounds, but still fairly fresh. These injuries were consistent with "blunt trauma," such as being punched with a fist or falling and hitting some object.

A pathologist testified the handling of the body after it was found rendered "some of the usual parameters to gauge time of death invalid." In response to a hypothetical question paralleling the circumstances of this case—including the stage of the rigor mortis of the victim's body and environmental factors such as the ambient temperature—the pathologist confirmed such circumstances would be consistent with the victim's having died at 11:00 a.m. on the day his body was discovered.[5]

---

[5] The investigating officer later testified as a witness in the defense case that he had written in a report that the pathologist had said the time of death "could be as early as 08:30 hours [and] as late as 11:00 hours."

After Compton's death was ruled a homicide, the police contacted Margaret Compton and instructed her to return the items she and her son had removed from the house. The police also conducted a more thorough search of the house, but did not conduct a full forensic examination because they considered the scene to have been contaminated. Using the records contained in Compton's notebook, the police entered the serial numbers of a number of unaccounted-for firearms into a computerized database of stolen property.

On August 19, 1993, the investigating officer learned that a Jeffrey Mahan recently had pawned in a local pawnshop a rifle with a serial number matching one that had been entered into the system. Police arrested Mahan and questioned him regarding the rifle. He told the police he had pawned the rifle at the request of his friend, Brian Ray. The police then obtained and served a search warrant for Brian Ray's residence, finding a total of 24 firearms, including 17 that were identified as having belonged to Compton. Ray and Dane Palmer, who was present in Ray's residence when the warrant was served, were arrested. Police later learned that Palmer also had pawned another of Compton's firearms at the same pawnshop Mahan had used.

Ray initially was charged with Compton's murder and possession of stolen property. He chose to cooperate with the police and, before the trial, the murder charge was dismissed. Following his guilty plea to possession of stolen property, he was granted a sentence of probation. His probation subsequently was revoked, and he was in the midst of serving 16 months in prison when he testified at defendant's trial. Ray confirmed at trial that he had not been promised anything in return for his testimony.

Ray testified that he had agreed to help defendant clean and store a number of his firearms because defendant was scheduled to go into custody the next day for a criminal matter unrelated to William Compton's murder. (See, *post*, fn. 6.)

6

Defendant told Ray the guns belonged to him, that he had inherited them from family members, and that he had proper documentation for them. While defendant was in prison, he called Ray a number of times asking about his guns, which he referred to as his "books." Ray initially stored the guns in a storage locker, but moved them to his apartment shortly before the police executed the search warrant because he was planning to give the guns to defendant's girlfriend, Beverly Westervelt. Ray had grown tired of defendant's repeated inquiries about the guns.

Beverly Westervelt testified that she had an on-again-off-again romantic relationship with defendant, which they had renewed in January 1992. After living together in an apartment, they began looking for a larger place to live. Defendant wanted to purchase a house near his mother's home on Holtby Road. In the summer of 1992, defendant took Westervelt and her children to look at a house on Holtby Road, although there was no indication the house was for sale. The home's owner was not interested in selling the house but told defendant the owner of the house across the street might be interested in selling his house. This turned out to be victim William Compton's house.

One evening, probably in September 1992, defendant took Westervelt and her children to look at Compton's house, which also had no indication it was for sale. After defendant parked in the driveway behind the house, they went to the backdoor and knocked. Compton answered the door and, in response to defendant's inquiry, said the house was not for sale. Compton nonetheless agreed to let them come inside to look at the house. According to Westervelt, defendant saw a rifle in a bedroom, and he and Compton proceeded to talk about Compton's gun collection for approximately 20 minutes. Compton showed defendant several other rifles. After staying about 45 minutes inside Compton's house, defendant, Westervelt, and her children left. Defendant brought Westervelt back to Compton's house approximately one week later to look at the backyard.

Defendant approached from an adjacent driveway and looked over the fence into Compton's yard.

Defendant eventually purchased a house in a different part of Bakersfield, and he, Westervelt, and her children moved into the house in October 1992. Westervelt and her children moved out in April 1993, and she did not have any contact with defendant for several months. On June 29, 1993, defendant was arrested and jailed on unrelated charges and he contacted Westervelt for assistance in helping him obtain bail. Defendant was released on bail on July 2; Compton was killed five days later.

At the end of July defendant agreed to stay away from his house and moved into a rental cottage.[6] He asked Westervelt to move some items out of his house for him, including two video cameras. She had not seen the cameras before and asked defendant where he had acquired them. He said he had purchased them at a bargain sale. Defendant told her to take the cameras and use them, so she stored them in her apartment. On her final visit to defendant's house, Westervelt, as defendant had requested, left the burglar alarm off and one of the exterior doors unlocked.

On August 10, 1993, Westervelt accompanied defendant to a place where he shot several handguns at bottles and cans. Westervelt had never seen defendant

---

**6** Defendant's arrest stemmed from accusations he had molested his neighbor's daughter. His agreement to stay away from his house, the court proceedings related to defendant's alibi defense, and the prison sentence he began serving in August 1993, which are discussed below, were related to the molestation charges. In the guilt phase of the present case, the jury was not told any of the specifics of the molestation charges and proceedings, and defendant was simply referred to as being "in custody."

8

with those guns before. Defendant told her he had bought them through newspaper advertisements.

As a result of his arrest for molestation at the end of June, defendant was scheduled to go into custody on August 12, 1993. In the days leading up to that date, defendant repeatedly asked Westervelt to store a number of firearms for him, but she refused and eventually suggested he ask Brian Ray to store the guns. Defendant and Westervelt arranged to meet Ray at a friend's house. Defendant parked in the garage, and he, Ray, and Ray's friend Dane removed more than 10 firearms from the trunk of defendant's car and proceeded to clean them. Defendant, however, did not leave the guns with Ray at that time because he was afraid something would happen to them. When Westervelt continued to refuse to store the guns, however, defendant eventually telephoned Ray and asked if he would store them. Defendant told Westervelt that Ray had agreed to store the firearms.

Westervelt later gave the police several items she said belonged to defendant, including the two video cameras. The serial numbers on the video cameras matched the serial numbers on the empty boxes found in Compton's house, and they contained videotapes with footage of Compton. She also turned over several letters defendant had written to her while he was in custody. In the letters, defendant repeatedly referred to his "books," which they had agreed would serve as a code for the firearms Ray was storing. Defendant primarily expressed his concern that nothing happen to his "books" and that they should be "preserved in time" "like mummies in an Egyptian tomb." At some point, Westervelt told defendant that an investigator had come to defendant's mother's house. Defendant's letters thereafter contained various statements that appeared to be purposefully vague or misleading regarding his not having possessed any firearms or video cameras, or having looked for a house in his mother's neighborhood. In

9

addition, defendant now told Westervelt that the "accountant" (the keeper of his "books") "needs to clean house." In another instance of a possible attempt to destroy evidence related to Compton's murder, defendant told Westervelt to spend the coins he had stored in a jar at his mother's house. Westervelt had never seen such a jar of coins when she was living with defendant.

Defendant's sister subsequently gave the police a jar of coins that had been at defendant's mother's house, and a Masons' ring that had been inside defendant's filing cabinet. The ring corresponded to the rank that Compton's deceased father had obtained within the Masons.

Karen Lehman, who was Brian Ray's sister, testified that in June 1993, defendant asked her to stay at his house from time to time to help prevent it from being vandalized. She thereafter spent some nights at the house, and on a few occasions she and defendant had sexual intercourse. On or shortly before July 4, 1993, Lehman asked defendant about his plans for the Independence Day holiday, and he told her he was planning to check in on a friend who was a sick, elderly man—either 72 or 76 years old—who lived on Holtby Road near defendant's mother's house.

Around July 8 or 9 (i.e., a day or two after the murder), defendant asked Lehman if he could store some items in the trunk of her car. When she asked why he needed her to store the items, defendant said it was because he was being "discriminated against." Lehman agreed, and after placing the items (which Lehman did not see) in the trunk, defendant had Lehman lock her car inside a garage. A few days later, Lehman told defendant she needed to use her car, so they drove the car to defendant's house. He removed the items from the trunk and took them inside. During a subsequent visit to defendant's house, Lehman saw more than 20 firearms in his bedroom. Defendant told her he had inherited some of them from his father and had purchased others through newspaper

10

advertisements. Defendant became intoxicated and threatened Lehman, saying he would harm her if she told anyone about the guns and he could arrange for someone else to harm her if he was unable to do it himself.

Robert Rowland, a convicted felon who had spent most of his adult life in prison, testified he was incarcerated with defendant in a correctional facility around the end of 1993. Defendant told him about killing an elderly man for his guns. Defendant mentioned a number of different types of guns and specifically listed some that were consistent with firearms that belonged to Compton and were recovered from Brian Ray. Defendant also told Rowland he had given the guns to someone and that person was "snitching on him." After telling the authorities about defendant's statements, Rowland was transferred to another institution. While at that institution, another inmate attempted to cut Rowland's throat, resulting in an injury requiring 12 stitches. Although Rowland initially did not want anything in return for testifying about what defendant had told him, after he was attacked he did not want to testify against defendant until the prosecutor agreed to request that prison authorities transfer him to an out-of-state facility.

Evidence regarding the prior-prison-term enhancement allegation under section 667.5, subdivision (b) was presented in a bifurcated proceeding after the jury reached its verdicts on the substantive charges. The prosecution introduced certified records showing that defendant had been convicted of possession of cocaine in 1987 and, after a revocation of his parole, had been released from prison on March 6, 1990, within five years of the murder.

### 2. *Defense Evidence*

The defense evidence centered on defendant's presence at a court proceeding on the morning of July 7, 1993 (the morning the evidence established Compton was murdered), when defendant's proceeding concluded, and whether it

11

was possible for defendant to have committed the murder that morning.[7] Defendant undisputedly was in court that morning seeking return of his bail bond premium in his molestation case. The reporter's transcript of the proceeding and various witnesses—including defendant's mother, his defense attorney, the prosecutor, and the courtroom bailiff—verified this. Telephone records and other testimony also indicated someone had placed a telephone call from defendant's house to his bail bondsman at approximately 11:50 that morning. The evidence and testimony did not, however, conclusively establish when defendant's court proceeding concluded. Based on the witness testimony and the defense attorney's notes from the other court proceeding he was involved in that day, defendant's court proceeding could have been completed as early as within a few minutes after 10:30 a.m., or as late as a few minutes before 10:55 a.m. If it was the former, there would have been sufficient (but not excessive) time for defendant and his mother to walk from the courthouse to his mother's car, which was parked at the defense attorney's nearby office, for defendant to drive them to his mother's house, and then for defendant to drive to the victim's house (arriving before Compton was to leave for his doctor's appointment and, presumably, before the telephone call Compton's friend made to him at 11:05 a.m.) and thereafter to commit the robbery and murder, leaving defendant enough time to return home to make the telephone call to his bail bondsman at 11:50 a.m. If defendant's court proceeding concluded closer to the later end of the range (i.e., 10:55 a.m.), it would have been exceedingly difficult, if not impossible, for defendant to have committed the murder.

---

[7]    Because the jury necessarily rejected the alibi defense, we provide only an abbreviated recitation of the supporting evidence.

Defendant's mother also testified she believed that, after arriving back at her house from court that morning, defendant remained there until 11:30 a.m. or noon, while he ate a sandwich and had a drink. She admitted, however (and other witnesses confirmed), that at various times before trial she had told different people she did not have a good memory of the events of that morning, including even whether she had attended court with defendant. Defendant had tried to convince her they were in court all day on July 7, 1993, but she knew this was incorrect because she had attended a birthday party for another of her sons on that day.

Darren Howard and Alfred Stone testified they each sold a firearm that the police subsequently seized from Brian Ray. Howard thought defendant might have been the person who purchased his rifle. Stone did not remember the person he had sold his rifle to, but defendant had a copy of the advertisement Stone had placed in the local newspaper. Beverly Westervelt testified defendant routinely kept significant amounts of cash on hand and often purchased items, including large items such as a used car, with cash.[8]

Vaughn Lehman testified he had been married to Karen Lehman for 22 years before their divorce and had known Brian Ray for approximately 25 years. In his opinion, both of them had bad reputations in the community for truth and veracity.

---

[8] Following an objection by the prosecution, the trial court excluded proffered testimony to the effect that defendant had told Westervelt and his friend Dutler Dauwalder he had purchased Compton's firearms and other belongings from a person staying in a house across the street from defendant's mother's house. Defendant's challenge to the trial court's ruling is discussed, *post*, in part I.B.4.

13

## B.  Issues

### 1.  *Defendant's Mental Competence*

At a number of points in the pretrial and trial proceedings, questions arose concerning defendant's mental competence to stand trial.  (See § 1367, subd. (a) ["A person cannot be tried or adjudged to punishment while that person is mentally incompetent."]; *Pate v. Robinson* (1966) 383 U.S. 375, 378 ["the conviction of an accused person while he is legally incompetent violates due process . . ."] (*Pate*).)  On appeal, defendant contends the trial court committed various errors in addressing this issue.  We conclude the trial court's failure to appoint counsel to represent defendant during one of the competency proceedings violated his statutory rights, resulting in a reversible miscarriage of justice.  We further conclude the matter should be remanded for a determination of whether a retrospective competency hearing is feasible and, if so, for the trial court to hold such a hearing.

### a.  *Background*

Throughout the proceedings in the trial court, defendant generally had difficult relationships with the attorneys appointed to represent and assist him.  Indeed, defendant went through five attorneys—and represented himself for a period of time—before settling on the two attorneys who eventually represented him during the trial.  Even those two attorneys, however, did not enjoy a particularly amicable relationship with defendant, as he continually expressed disagreement and dissatisfaction with them, to the point where, during his own counsel's closing argument at the penalty phase, defendant's vocal interruptions became so disruptive that the trial court ordered him removed from the courtroom.  Defendant's outbursts during the proceedings were not directed at defense counsel only; he also consistently interrupted the court, the prosecutor, and various witnesses (both defense and prosecution).  Defendant's behavior led his attorneys

14

on a number of occasions to express doubts concerning his mental competence to proceed. Although the trial court twice suspended the proceedings to have defendant examined by experts for competence, it found defendant competent both times. At other times, the court disagreed that a doubt existed concerning defendant's ability to understand the proceedings and assist his attorneys and declined to suspend the proceedings for a psychiatric examination of defendant.

Defendant's first appointed attorney was Stan Simrin, but the trial court granted Simrin leave to withdraw because defendant was unwilling to waive the statutory deadline for trial to commence (see § 1382, subd. (a)(2)) and Simrin could not competently prepare for trial within that time period. Defendant's second attorney, Donnalee Huffman, withdrew for the same reason only days after she was appointed. On March 3, 1994, 10 days after he was appointed, defendant's third attorney, Edward Brown, filed a "Motion for PC 1368(b) and PC 1368(c)," requesting that the trial court order a mental competency hearing for defendant and suspend the proceedings until he was determined to be competent. The motion did not provide any details concerning counsel's reasons for doubting defendant's competence. Nevertheless, on March 7, 1994, the trial court granted the motion, suspended the trial proceedings, and arranged for defendant to be interviewed by a psychiatrist. In response to the court's order, defendant questioned how the court could "suspend criminal proceeding[s] without giving [him] an opportunity to speak," and stated, "Cancel the doctor's appointment. I don't need a doctor. I refuse."[9]

---

[9]     In a declaration accompanying a motion for a continuance that was filed after the trial court suspended the proceedings, Attorney Brown stated he had filed the motion regarding his client's competence because of defendant's "unwillingness to cooperate and his demand to go to trial within the statutory

*(footnote continued on next page)*

15

As promised, when the psychiatrist designated to evaluate him, Dr. Richard Burdick, arrived for the interview, defendant refused to answer any questions. Defendant informed Dr. Burdick that he was seeking to have his attorney removed by "initiat[ing] a *Marsden*" (*People v. Marsden* (1970) 2 Cal.3d 118), and therefore he needed to "protect his rights" and would speak only in court. In his subsequent two-page report filed with the court, Dr. Burdick stated his "brief encounter" with defendant was not sufficient to complete a "formal psychiatric evaluation," but from Dr. Burdick's limited observation of defendant "[i]t would seem apparent at this point that this man is in control of his faculties and is not demonstrating a psychiatric illness at this point." Dr. Burdick noted the jail staff had reported behavior suggesting defendant was "deliberately disruptive and a trouble maker but [not] psychotic." In conclusion, Dr. Burdick opined defendant was "able to understand the nature and purpose of the proceedings taken against him and if he so chooses, he is capable of cooperating in a rational manner with counsel in presenting a defense."

At the competency hearing before the trial court on March 28, 1994, Attorney Brown and the prosecutor both stated they would submit the matter of defendant's competence based on Dr. Burdick's report, and the trial court, without further discussion, found defendant competent to stand trial.

Immediately after that finding, defendant personally filed a motion to recuse the judge under Code of Civil Procedure section 170.6, which the court granted. Defendant's *Marsden* motion was heard later that morning before a different judge. In a long statement to the court, defendant accused Attorney

_____

*(footnote continued from previous page)*

period runs afoul of sound reason," and therefore counsel sought to resolve whether there was a "clinical reason" for defendant's behavior.

Brown of failing to take any steps to develop a defense to the charges. Brown, in contrast, stated defendant had been hostile and uncooperative from the beginning of the appointment. The court, in denying the motion to relieve counsel, stated that in its view "this is more of an issue of cooperation between counsel and the defendant[, a]nd the court is concluding very quickly that the defendant is not cooperating with his counsel. That doesn't mean that he is entitled to the appointment of other counsel and [to] keep going through a number of counsel until such time as he is going to cooperate." Later that day, Brown requested the appointment of a second attorney to represent defendant due to the complexity of the case and the circumstance that, because of "the client's attitude," in counsel's view "it's going to take at least two of us to handle this situation." The court agreed to appoint James Sorena as second counsel.

Defendant next filed a motion to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). At the hearing on that motion, defendant gave a rambling statement criticizing his attorneys' performance and accusing them of participating in a conspiracy against him. The trial court considered defendant to have renewed his *Marsden* motion and conducted a hearing on that issue. When questioned by the court, Attorney Brown again stated defendant had refused to cooperate, except with regard to the preparation of the *Faretta* motion, and communication between them concerning the case was impossible because defendant "has an opinion that the system has absolutely walked over him, that he hasn't been fairly represented." The *Marsden* hearing was continued to the next day, and defendant repeated his allegations of a conspiracy against him, claiming the transcripts of various court proceedings had been altered and his defense attorneys were helping the district attorney convict him. During these hearings, defendant at times talked too fast for the court reporter to record what he had said, and his answers to various questions from the

17

court often strayed to other topics without answering the questions that had been asked. The trial court ultimately denied the *Marsden* motion.

At this point, Attorneys Brown and Sorena again asked the trial court to declare a doubt regarding defendant's mental competence to proceed. They observed that the first competency hearing might not have complied with the statutory requirements because, despite defendant's apparent view he was not incompetent, the court had appointed only one expert to assess his competence. (See § 1369, subd. (a) ["In any case where the defendant or the defendant's counsel informs the court that the defendant is not seeking a finding of mental incompetence, the court shall appoint two psychiatrists, licensed psychologists, or a combination thereof."].) Further, in counsel's view, defendant's courtroom statements and behavior indicated he was not mentally competent to proceed. The trial court disagreed that defendant's competence was in doubt, stating it believed defendant was able to communicate and cooperate with counsel in a rational manner if he chose to do so.

At a subsequent hearing on April 11, 1994, the trial court, after a very lengthy discussion, granted defendant's *Faretta* motion and relieved Attorneys Brown and Sorena. Two days later, at defendant's request, Attorney Ralph McKnight, Jr., was appointed as advisory counsel for defendant. On June 29, 1994, Attorney McKnight, although serving only as advisory counsel, filed a motion requesting that the trial court terminate defendant's self-representation due to his asserted mental incompetence. Included with the motion were declarations from McKnight and defendant's former attorney, Sorena. McKnight declared that in his view, based on the eight times he had met with defendant, defendant was "demonstrating signs of serious mental instability" and "appears to be unable to comprehend and appreciate either the substantive or the procedural law which is applicable in this matter." According to McKnight, defendant's "prior waiver of

18

counsel appears to be a direct outgrowth of his delusion that the justice system in general, and defense attorneys in particular, are in league against him in an all pervasive conspiracy. He also appears to have a belief in his own super competence, which causes [him] to believe that he alone has the correct interpretation of the law. These delusions render him incompetent to knowingly and intelligently appreciate the difficulties he will face representing himself and what is at stake." McKnight reported that, as was the case with defendant's prior attorneys, defendant "refuses to cooperate with myself as his advisory counsel, refuses to accept advice from me, and remains hostile, accusatory and suspicious." Further, defendant had repeatedly asked counsel to make various motions or take other actions which were "impossible, impractical or inconsistent," and then cited counsel's refusal to follow defendant's orders as further proof counsel was "part of the conspiracy against him."

Attorney Sorena's declaration echoed these concerns. In their first meeting, defendant could not focus his discussion, was very suspicious of Sorena, and by the conclusion of the 45-minute meeting was convinced that Sorena was "part of a pervasive conspiracy against him." According to Sorena, defendant believed "all members of the justice system were in collusion to execute him, including the court reporters who falsified the transcripts of prior hearings." Based upon Sorena's contact with another criminal defendant who had been diagnosed with paranoid and delusional disorders, Sorena "was convinced after my interview with [defendant] that he was genuinely delusional to the point where his ability to assist counsel was in substantial doubt."

On July 7, 1994, the trial court, based on Attorney McKnight's motion and over defendant's objections, again suspended the proceedings for an assessment of defendant's mental competence. The court, however, permitted defendant to

continue to represent himself, including choosing one of the experts who would interview him.

The two resulting medical opinions concerning defendant's competence presented to the court in written reports came to conflicting conclusions. The expert chosen by the court, Psychiatrist Luis Velosa, concluded defendant was "suffering from a psychiatric disorder which impairs his thinking process . . . best classified as bipolar disorder (manic type) or a paranoid disorder. The defendant at present is exhibiting psychotic symptoms characterized by a thought disorder in which [he] experiences racing thoughts, looseness of associations, rambling of thoughts, sometimes without any logical connection. In addition, the defendant experiences paranoid thinking, persecutory delusions, [and] a false belief that there is a conspiracy against him." Dr. Velosa concluded that defendant "is at present able to understand the nature and purpose of the proceedings taken against him. However, because of his psychiatric symptoms, the defendant at present is unable to cooperate in a rational manner with counsel in presenting a defense. Furthermore, despite . . . the fact that the defendant has a vast knowledge of the legal system and legal proceedings, because of his psychiatric symptoms, [he] is not able to represent himself." Dr. Velosa also noted that defendant's judgment was "impaired and he [had] no insight into his mental disorder."

The expert chosen by defendant, Psychiatrist Sakrapatna Manohara, found defendant to be "generally cooperative but . . . quite manipulative." Defendant's speech was "coherent but appeared to be circumstantial," and he was "blaming all his problems on the system." Dr. Manohara found defendant "did not appear to be really delusional although he was highly mistrustful of the system and the attorneys." According to Dr. Manohara, defendant "performed well" in tests designed to assess his memory and concentration, and he "showed appropriate affect to thought content." Defendant exhibited "some anger and frustration" at

20

being "railroaded" and believed he needed to "let go and let God take care of things." In Dr. Manohara's opinion, defendant had a "grandiose sense of self importance," tended to "exaggerate achievements and talents," spoke in a manner that was "excessively impressionistic and lacking in detail," and believed "his problems [were] unique and [could] only be understood by other special people." Defendant did not have a "clear-cut psychotic disorder," but did appear to be "excessively mistrustful of the system," and exhibited a narcissistic personality disorder. Dr. Manohara concluded that defendant's "personality disorder makes it difficult to work with him as an attorney but . . . he is competent to stand trial. However, he is not competent to represent himself because of his lack of objectivity and his grandiose sense of self importance and his tendency to be circumstantial with a sense of entitlement. He may over-react to criticism with feelings of rage."

The trial court held a hearing concerning defendant's mental competence on July 28, 1994. In summarizing the doctors' reports, the trial court noted Dr. Manohara had found defendant competent to stand trial, while "Dr. Velosa, although he reflects what I would suggest to be some reservation in that regard, he does indicate that [defendant was] able to understand the nature and purpose of the proceedings." Defendant, who continued to represent himself at the hearing, insisted he was competent to proceed and demanded a jury trial on the issue of his mental competence. The prosecutor, also apparently desiring a finding defendant was competent, suggested defendant waive his right to a jury trial and agree to submit the matter on the experts' reports if the trial court was "inclined to find that [defendant] is competent to stand trial, which I believe is what he wishes." The trial court then asked defendant whether he would "waive a jury trial on that issue so we can get on with the show." Defendant agreed to do so, and the court proceeded to find defendant competent. Thereafter, Attorney McKnight, who had

not participated in the hearing, asked to be relieved as advisory counsel based on the complete breakdown of his relationship with defendant. The trial court granted the request.

Although the trial court had found defendant competent for purposes of continuing with the proceedings, the court nonetheless expressed concerns regarding whether defendant was competent to waive his right to counsel and to represent himself, and on August 2, 1994, it held a hearing to address that issue. At the hearing, defendant continued to represent himself. After the three doctors (Drs. Burdick, Velosa, and Manohara) who previously had evaluated defendant's mental competence testified, the trial court found defendant's waiver of the right to counsel was valid. In the court's view, defendant's difficulties in focusing and effectively communicating were the result of his excited state and his lack of experience in courtroom proceedings. The court said it was "sure much of that will settle down when you're in a trial situation, and I don't think that that in any way would indicate to this Court that you cannot make a knowledgeable and intelligent waiver as to your right to represent yourself." The court then appointed Attorney James Gillis as advisory counsel for defendant.

Paralleling the experience of defendant's prior attorneys, Attorney Gillis, on September 12, 1994, filed a motion to terminate defendant's self-representation because defendant was not mentally competent. In the declarations submitted with the motion, Gillis recounted defendant's delusions concerning the conspiracy against him, which were negatively affecting counsel's ability to assist him and defendant's own ability to prepare a defense. At the hearing on the motion, defendant stated he would voluntarily waive his right to represent himself if the court would agree to appoint Attorney William Dougherty as lead counsel, with Gillis perhaps continuing as cocounsel. Defendant would accept the appointment of Dougherty because he was an attorney who primarily practiced in a different

22

county.  The trial court appointed Dougherty and Gillis as suggested, and the case proceeded to trial.

Although Dougherty and Gillis continued to represent defendant through the trial, their relationship with defendant was not an easy one.  As the trial progressed, defendant became more and more disruptive.  He made faces and comments during witnesses' testimony and the attorneys' arguments.  He repeatedly professed his innocence and proclaimed his belief there was a far-reaching conspiracy against him that involved altering the transcripts of the court proceedings he had attended on the day of the murder and the preliminary examination in the present case.  The trial court at times expressed its view that it appeared defendant could not control himself and his outbursts in front of the jury likely were detrimental to his defense.  When the guilt phase verdict was announced, defendant shouted that the case against him was a fraud and he was innocent.  His reaction was so riotous that the jury was cleared from the courtroom, and after a several-minute tirade by defendant, the trial court threatened to order defendant gagged if he could not control himself.  After a discussion with defense counsel, defendant agreed to remain silent for the remainder of the reading of the verdict.

Before the penalty phase began, counsel filed yet another motion to suspend the proceedings due to defendant's asserted mental incompetence.  At the next court proceeding, counsel stated defendant had progressively become more and more delusional and paranoid regarding the conspiracy against him, and at that point defendant not only could no longer assist counsel in a rational manner but was actually undermining the defense efforts.  The prosecutor, however, expressed the view that defendant was a "master manipulator" and, as the trial court had consistently found in the past, was able to cooperate with counsel but, for his own reasons, was choosing not to do so.  The trial court refused to declare a

23

doubt concerning defendant's mental competence, stating it was "fully convinced that [defendant] has a mental capacity—he may not have a mental discipline, but he's got a mental capacity to be fully aware of what's happening, what's going on with what the procedures are." The court noted that, rather than there being a breakdown in communication between defendant and counsel, it appeared defendant was "constantly talking to his attorneys." The court permitted defendant to read a statement into the record in which he again made his allegations of fraud and conspiracy. Later that day, during a conference outside the presence of the jury, the trial court reiterated that "the court does not have any doubt as to [defendant's] competency to stand trial in this matter."

When defendant expressed his intention to testify at the penalty phase, despite defense counsel's fervent advice not to do so, the trial court attempted to obtain an on-the-record waiver of defendant's right to remain silent. Defendant, however, would not expressly agree to make such a waiver, and the court ultimately stated that, in its view, defendant's testifying would be "very detrimental" to his interests because "he can't seem to discipline his thought processes, [and] respond to the simple questions I'm asking him about his right to remain silent." Defense counsel reminded the court they believed defendant was not mentally competent to proceed, but the court stated it believed defendant was merely "in a position of denial" regarding the crimes. The trial court ultimately found that defendant was validly waiving his right to remain silent.

As defense counsel predicted, defendant's penalty phase testimony was unhelpful. His testimony in general was rambling, and the court and his attorneys repeatedly admonished him to answer the questions that were asked. He testified the evidence presented at the guilt phase to support his alibi defense was entirely fraudulent, and he actually had been in a different courtroom for the entire day of the murder. During closing arguments, defendant became more and more

24

boisterous, repeatedly interrupting both the prosecutor and defense counsel, to the point where, during defense counsel's final argument, the trial court ordered defendant removed from the courtroom for the remainder of the argument. Defendant thereafter watched, from another courtroom, a video feed of the rest of counsel's argument. The trial court, anticipating continued disruptive behavior, instructed security personnel to gag defendant if he continued to have outbursts that were likely to disrupt any proceedings in the courthouse.

The next morning, defense counsel, citing the events of the previous day, again requested that the trial court suspend the proceedings in order to evaluate defendant's mental competence. The trial court again expressed its view that defendant was voluntarily choosing not to cooperate with counsel and merely had a bad "attitude." The court declared, "There is no doubt in this Court's mind as to the competence of [defendant], none whatsoever."

At the hearing on defendant's motion for a new trial, the automatic application to modify the verdict, and the court's imposition of the sentence, defendant continued to interrupt the proceedings. The court ultimately ordered defendant gagged and restrained in his chair. Defendant nonetheless was able to struggle free of the gag, at which point he requested a *Marsden* hearing. Defendant was again gagged, and the sentencing proceeding continued. The court ultimately allowed defendant to make a final statement in which he restated his allegations of fraud and conspiracy.

### b. *Failure to Appoint Counsel for Defendant During Second Section 1368 Proceedings*

As recounted above, defendant's counsel moved five different times during trial to have the trial court declare a doubt about defendant's mental competence to stand trial. The court granted two of the motions—the first on March 7, 1994, and the second on July 7, 1994—held hearings both times, and twice concluded

25

defendant was not incompetent.  On appeal, defendant makes a number of claims related to his five motions and two competency hearings.  One such claim is meritorious:  the trial court erred in allowing defendant to represent himself during the competency proceedings following the trial court's second declaration of doubt under section 1368.  We conclude this error constitutes a reversible miscarriage of justice and the appropriate remedy at this time is to remand to the trial court to allow it to conduct a retrospective competency hearing, if feasible.

### i.  *Standards of mental competence*

The United States Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.' " (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354.)  A defendant is deemed incompetent to stand trial if he lacks " ' "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [or] a rational as well as factual understanding of the proceedings against him." ' " (*Ibid.*, quoting *Dusky v. United States* (1960) 362 U.S. 402, 402 (*Dusky*).)  "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." (*Drope v. Missouri* (1975) 420 U.S. 162, 181 (*Drope*).)  State constitutional authority is to the same effect.  (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1063.)

The applicable state statutes essentially parallel the state and federal constitutional directives.  Section 1367, subdivision (a) provides:  "A person cannot be tried or adjudged to punishment while that person is mentally incompetent.  A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable

26

to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

Section 1368 provides in pertinent part: "(a) If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. If the defendant is not represented by counsel, the court shall appoint counsel. At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time. [¶] (b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in the superior court."

As we stated in *People v. Welch* (1999) 20 Cal.4th 701, 737-738, a trial court is obligated to conduct a full competency hearing if substantial evidence raises a reasonable doubt that a criminal defendant may be incompetent. This is true even if the evidence creating that doubt is presented by the defense or if the sum of the evidence is in conflict. The failure to conduct a hearing despite the presence of such substantial evidence is reversible error.

### ii. *Self-representation at competency proceedings is improper*

At the time the trial court declared a doubt regarding defendant's competence to stand trial on July 7, 1994—thereby triggering the second

27

competency hearing—defendant had been representing himself. Did the trial court err by allowing defendant to represent himself during the resulting competency proceedings?[10] That the court violated state statutory law by failing to appoint counsel is beyond question. The plain language of section 1368, specifically addressing the procedures in criminal competency proceedings, provides that when the trial court states on the record that a doubt exists concerning the defendant's mental competence, "[*i*]*f the defendant is not represented by counsel, the court shall appoint counsel.*" (§ 1368, subd. (a), italics added.) Nothing could be clearer.

The People raise three ultimately unpersuasive counterarguments to the position that the trial court erred under section 1368 by failing to appoint counsel to represent defendant during the competency proceedings. They first contend that when a doubt about a self-represented defendant's competence is declared, section 1368 requires the appointment of counsel merely to allow the trial court to receive preliminary argument—in advance of the decision whether to suspend the trial—as to whether the defendant is competent or not, but does not require legal representation of the defendant throughout any subsequent competency proceedings. This interpretation of section 1368 is meritless, for the plain meaning of the statutory language admits no such limitation. " 'Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' " (*In re Jennings* (2004) 34 Cal.4th 254, 265.)

---

**10** We recently reserved this question in a case in which the defendant was acting not as his own attorney but as cocounsel with an attorney. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 283, fn. 13.)

28

Moreover, section 1369, which sets forth the procedures for the competency hearing, indicates the Legislature's intention that a criminal defendant be represented by counsel at a competency hearing. That section provides: "*The counsel for the defendant* shall offer evidence in support of the allegation of mental incompetence." (§ 1369, subd. (b)(1), italics added.) The Legislature thus contemplated a defendant would be represented by counsel throughout the competency proceedings.

The People's second counterargument fares no better. Although section 1368 requires the trial court to "appoint counsel" if "the defendant is not represented by counsel," the People contend the appointment of Attorney McKnight as advisory counsel for the competency proceedings satisfied the statutory requirement. We disagree: Attorneys serving in an advisory or standby capacity do not "represent" the defendant, which is the clear mandate of the statute. (See *People v. Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14 ["[I]f the accused decides to represent himself under *Faretta*, *he* assumes primary control of, and responsibility for, his defense."]; cf. *McKaskle v. Wiggins* (1984) 465 U.S. 168, 179 ["*Faretta* rights are adequately vindicated in proceedings outside the presence of the jury if the *pro se* defendant is allowed to address the court freely on his own behalf and if disagreements between counsel and the *pro se* defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel."].)

The instant case serves to illustrate the inadequacy of the presence of mere advisory counsel. Although it was McKnight's motion that gave rise to the competency proceedings, he had no opportunity to address the court when defendant's competence was discussed at the July 28, 1994, hearing. His views regarding the experts' reports, which reached opposing conclusions concerning defendant's competence to stand trial, and the prosecution's suggestion that

defendant waive a jury trial and submit the matter with the understanding the trial court would find him competent, were never aired. (Cf. *Wise v. Bowersox* (8th Cir. 1998) 136 F.3d 1197 [no error in allowing the defendant to represent himself at a competency hearing because standby counsel was allowed to speak and examine expert witnesses].) McKnight, who—as far as the record discloses— never abandoned his belief that defendant was incompetent at least to represent himself, clearly did not "represent" defendant in the competency proceedings.

Third, we reject the People's novel assertion that section 1404, which specifies that errors in failing to comply with the provisions of the Penal Code do not invalidate the proceedings unless the defendant was prejudiced by the error, excuses a trial court from following the statutory requirements. Section 1404 is a harmless error rule to be applied in *the review* of a judgment (see *People v. Cahill* (1993) 5 Cal.4th 478, 524-527); it is not, as the People contend, a license for the trial court in the first instance to ignore or contravene the provisions of the Penal Code so long as the court believes its actions will not prejudice the defendant.

The People also rely on decisions of the federal courts of appeals that found no error occurred when the trial courts in those cases allowed the defendants to represent themselves while the court considered their mental competence. Reliance on those authorities is misplaced because, unlike in the present case, those cases (*Porter v. Attorney General* (11th Cir. 2008) 552 F.3d 1260; *U.S. v. Morrison* (2d Cir. 1998) 153 F.3d 34; *U.S. v. Nichols* (2d Cir. 1995) 56 F.3d 403) did not involve any statutory requirement that counsel represent the defendants in the proceedings at issue. (See also *People v. Robinson* (2007) 151 Cal.App.4th 606, 614-616 [distinguishing *Nichols* and *Morrison* based on the proceedings at issue constituting merely " 'precautionary measure[s]' " rather than full competency proceedings]; *U.S. v. Zedner* (2d Cir. 1999) 193 F.3d 562, 565 [distinguishing the holding of *Morrison* on the same ground].)

To the extent the People contend defendant was properly permitted to circumvent the statutory requirement by purporting to waive representation by counsel, we disagree. First, no language in the statutes authorizes such a waiver. Second, as we have held for decades, neither the state constitutional right to the assistance of counsel in criminal cases nor the general right to due process guarantees a criminal defendant's right to waive counsel; accordingly, defendant had no right to self-representation under the California Constitution that could have overridden the statutory requirement of legal representation in competency proceedings. (*People v. Taylor* (2009) 47 Cal.4th 850, 871-872; *People v. Sharp* (1972) 7 Cal.3d 448, 457-461.) Finally, as we explain, the statutory requirement that a defendant be represented by counsel during proceedings to evaluate his or her mental competence does not violate the defendant's federal constitutional rights.

In *Sharp*, this court concluded that neither the state nor the federal Constitution created a constitutional right of a criminal defendant to self-representation. (*People v. Sharp*, *supra*, 7 Cal.3d at pp. 457-458.) In *Faretta*, the high court, of course, overruled our interpretation of the federal constitutional provision. (*Faretta*, *supra*, 422 U.S. at p. 819 ["Although not stated in the [Sixth] Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment."].) As we stated in *Taylor*, "[i]n the wake of *Faretta*'s strong constitutional statement, California courts tended to view the federal self-representation right as absolute, assuming a valid waiver of counsel." (*People v. Taylor*, *supra*, 47 Cal.4th at p. 872.) This absolutist view of the federal right was further cemented by a common interpretation of the high court's subsequent decision in *Godinez v. Moran* (1993) 509 U.S. 389, in which the court held the constitutional standard for assessing a defendant's mental competence to waive the

31

right to counsel was the same as the standard for assessing his or her competence to stand trial. (*Id.* at p. 398 ["[W]e reject the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard."]; see *Dusky*, *supra*, 362 U.S. at p. 402.) It was generally believed by the courts of many jurisdictions, including California, that because any defendant who was competent to stand trial was also competent to waive counsel, a court therefore could not preclude a defendant who was found competent under the *Dusky* standard from representing himself or herself at trial. (See, e.g., *People v. Welch*, *supra*, 20 Cal.4th at p. 732-734.)

In *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*), however, the high court rejected the absolutist view of the right to self-representation and clarified that the *Faretta* right may be restricted in circumstances other than when the defendant is not competent to validly waive the assistance of counsel under the *Dusky* standard. At issue in *Edwards* was whether the Indiana trial court had properly denied the *Faretta* motion of a defendant who suffered from schizophrenia. Evaluating how the defendant's mental illness affected him, the trial court found him competent to stand trial, but not " 'competent to defend himself.' " (*Edwards*, at p. 169.) The high court ultimately concluded the trial court's ruling was constitutionally permissible: "[T]he Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Id.* at p. 178; see also *id*. at p. 174 ["[T]he Constitution permits a State to limit [a] defendant's self-representation right by insisting upon representation by counsel at trial—on the ground that the defendant lacks the mental capacity to conduct his trial defense unless represented."].)

32

Recently, in *People v. Johnson* (2012) 53 Cal.4th 519, we adopted the limitation on self-representation authorized in *Edwards*. In reaching the conclusion that California courts have discretion to deny self-representation to "gray-area defendants" meeting the *Edwards* standard, we concluded that California courts are constitutionally permitted to restrict the exercise of the right to self-representation to the extent permitted by the federal Constitution and that, in fact, "to refuse to recognize such discretion would be inconsistent with California's own law." (*Johnson*, at p. 528.)

As clarified in *Edwards*, the high court's decisions in this area establish that (1) the federal constitutional right to the assistance of counsel in criminal cases includes the right to waive the assistance of counsel (*Faretta*); (2) in determining the validity of a purported waiver of the right to counsel, the federal Constitution requires no more than that the choice be made voluntarily and intelligently by a defendant who is found to be competent under the *Dusky* standard (*Godinez v. Moran*); and (3) states may in some circumstances apply additional restrictions on the defendant's exercise of the right to self-representation without violating *Faretta* (*Edwards*). Consequently, even assuming the federal Constitution might otherwise permit a criminal defendant to waive the assistance of counsel at mental competency proceedings, we believe that, in light of *Edwards*, the California statutory requirement of representation by counsel during competency proceedings does not violate the defendant's Sixth Amendment rights.

In reaching its conclusion in *Edwards* that the states may validly impose a mental-illness-related limitation on the right to self-representation, the high court acknowledged that allowing a mentally ill defendant to represent himself or herself would be "at least as likely to prove humiliating as ennobling" to the defendant's personal " '[d]ignity' " and " 'autonomy,' " the interests that form the basis of the right to self-representation. (*Edwards*, *supra*, 554 U.S. at p. 176.) The

33

court also recognized the important constitutional value that "proceedings must not only be fair, they must 'appear fair to all who observe them,' " a dubious prospect, the court noted, when a mentally ill person is permitted to represent himself or herself in a criminal trial. (*Id.* at p. 177.) These concerns are equally at issue regarding self-representation during mental competency proceedings. Insisting upon representation by counsel in such proceedings is consistent with upholding the dignity and autonomy of the defendant and, more importantly, protects not only the fairness of the proceedings, but also the appearance of fairness.

As an initial matter, we observe that the issue to be resolved in section 1368 proceedings is whether the defendant meets the *minimum* standard of mental competence to stand trial under *Dusky*, an issue that would call into question, as well, the defendant's competence to validly waive the right to counsel were he or she attempting to make such a waiver at that time.[11] For the same reason (i.e., an

---

[11] A number of courts have so concluded. (See *U.S. v. Frazier-El* (4th Cir. 2000) 204 F.3d 553, 559 [the trial court properly refused to entertain the defendant's *Faretta* motion before evaluating his competence to stand trial]; *U.S. v. Boigegrain* (10th Cir. 1998) 155 F.3d 1181, 1186 [same]; see also *People v. Robinson*, *supra*, 151 Cal.App.4th at p. 616 [concluding that "If the court has a reasonable doubt as to the defendant's competency to stand trial, that doubt should extend to the defendant's competency to waive counsel and represent himself."]; *U.S. v. Klat* (D.C. Cir. 1998) 156 F.3d 1258, 1263 [finding it "contradictory to conclude that a defendant whose competency is reasonably in question could nevertheless knowingly and intelligently waive her Sixth Amendment right to counsel"]; *U.S. v. Purnett* (2d Cir. 1990) 910 F.2d 51, 55 [stating that "Logically, the trial court cannot simultaneously question a defendant's mental competence to stand trial and at one and the same time be convinced that the defendant has knowingly and intelligently waived his right to counsel."]; cf. *People v. Horton* (1995) 11 Cal.4th 1068, 1108 [when trial was suspended after the trial court's declaration of doubt as to the defendant's competence, under state statutory provisions, the court lacked jurisdiction to rule on the defendant's pending *Faretta* motion].)

34

apparent lack of mental competence under *Dusky*), we reject any suggestion that, by failing to object, a defendant who has been permitted to continue to represent himself or herself during competency proceedings has forfeited or waived a claim of error under the statute. (Cf. *Medina v. California* (1992) 505 U.S. 437, 450 ["The rule announced in *Pate* was driven by our concern that it is impossible to say whether a defendant whose competence is in doubt has made a knowing and intelligent waiver of his right to a competency hearing."].)

Further, in our view, if, as transpired in this case, a criminal defendant whose mental competence is in question is permitted self-representation and to maintain he or she is competent to stand trial, a breakdown occurs in the process of meaningful adversarial testing central to our system of justice. (See *United States v. Cronic* (1984) 466 U.S. 648, 655 [" 'The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.' "]; *U.S. v. Purnett*, *supra*, 910 F.2d at p. 56 [recognizing an appointed attorney's responsibility to ensure an adequate examination of the evidence regarding the defendant's competence].) This absence of true adversarial testing occurred here, where defendant—apparently wishing to be found competent— acceded to the prosecutor's offer to forgo a jury trial and submit the issue of competence on the experts' reports if the trial court was "inclined to find that [defendant] is competent to stand trial, which I believe is what he wishes." The trial court then asked defendant whether he would "waive a jury trial on that issue so we can get on with the show." Defendant agreed to do so, and the court proceeded to find defendant competent, despite conflicting expert opinion on the issue.

That an attorney representing defendant might similarly have chosen to submit the question on the experts' reports, waive a jury, and forgo argument does

not change the analysis. In such cases, the trial court, as well as other observers of the proceedings, may presume such actions are reasonable tactical choices made by trained counsel based on the evidence. The decision of a possibly incompetent defendant not to contest the issue of his or her own competence is entitled to no such credit. Indeed, such a decision ought to be considered inherently suspect, especially when, as in the instant case, the evidence before the court is in conflict regarding the defendant's mental competence. (Cf. *People v. Samuel* (1981) 29 Cal.3d 489, 495 ["[I]f counsel represents a defendant as to whose competence the judge has declared a doubt sufficient to require a section 1368 hearing, he should not be compelled to entrust key decisions about fundamental matters to his client's apparently defective judgment."]; *Bundy v. Dugger* (11th Cir. 1987) 816 F.2d 564, 566, fn. 2 ["Whether the defendant believed he was competent to stand trial is irrelevant for, if a defendant is incompetent to stand trial, his belief that he is able to do so is without import."].) Although a prosecutor—regardless of the defendant's position—might be said to have an interest in ensuring the competency issue is adequately addressed in order to preserve the results of the eventual trial, the prosecutor's interests are no substitute for the participation of an advocate expressly tasked with promoting the defendant's right to a fair trial. And if a defendant were to assert that he or she was *incompetent*, allowing such a defendant to attempt to prove his or her own incompetence would be nonsensical. As we stated in *People v. Hill* (1967) 67 Cal.2d 105, 115, footnote 4, "[w]hen evidence indicates that the defendant may be insane it should be assumed that he is unable to act in his own best interests." Representation by counsel during mental competency proceedings therefore fosters both the fairness and appearance of fairness of the proceedings.

In addition, the primary reasons underlying *Faretta*'s recognition of the right to waive counsel—the fundamental right to autonomy and the circumstance

36

that it is "[t]he defendant, and not his lawyer or the State, [who] will bear the personal consequences of a conviction" (*Faretta*, *supra*, 422 U.S. at p. 834)—are not implicated in competency proceedings as in other parts of a criminal trial. As a general matter, competency proceedings do not force a defendant to "bear the personal consequences of a conviction" based on a defense to which he or she has not consented. As the court stated in *U.S. v. Purnett*, *supra*, 910 F.2d at page 56, "the unwanted participation of appointed counsel during pretrial hearings and conferences is much less intrusive on the right to self-representation than such participation at trial. [Citation.] Hence, appointing counsel for the limited period needed to determine whether a defendant is competent to stand trial is not viewed as a denial of the defendant's right to self-representation." (Cf. *People v. Masterson* (1994) 8 Cal.4th 965, 971 [observing that in competency proceedings, "the defendant necessarily plays a lesser personal role"].) At the conclusion of the competency proceedings, the trial court will find the defendant either competent to stand trial—in which case the defendant may discharge counsel and represent himself or herself if found competent to proceed under *Edwards*, *supra*, 554 U.S. 164, and *People v. Johnson*, *supra*, 53 Cal.4th at pp. 530-531, or incompetent to stand trial—in which case the court will suspend the trial until the defendant's competence is restored. The choice of what defense to the charges, if any, will be presented at trial, and the concern the defendant might be convicted following the presentation of a defense to which he or she has not consented, simply are not implicated by the appointment of counsel to represent the defendant during mental competency proceedings.

Although we recognize, as the People assert, that the trial court at the time of trial might have believed it had been placed between a rock (§ 1368) and a hard place (*Faretta*), we nonetheless conclude the court's failure to appoint counsel to represent defendant during the second competency proceedings violated

37

defendant's statutory rights.[12] As discussed *post*, we conclude the statutory error is reversible, subject to the initial remedy of a remand for a retrospective competency hearing. Because defendant would be entitled to no greater remedy were we to conclude that the failure to appoint counsel to represent him during the competency proceedings constituted either state or federal constitutional error, we decline to decide whether defendant's constitutional rights were also violated.

### iii. *Failure to appoint counsel constituted reversible error*

Under article VI, section 13 of our state Constitution, trial error does not merit reversal of a judgment unless "the error complained of has resulted in a miscarriage of justice."[13] Typically, a defendant who has established error under state law must demonstrate there is a reasonable probability that in the absence of the error he or she would have obtained a more favorable result. (*People v. Weaver* (2001) 26 Cal.4th 876, 968; *People v. Watson* (1956) 46 Cal.2d 818, 836.) As we have explained, however, "under the California constitutional harmless-error provision some errors . . . are not susceptible to the 'ordinary' or 'generally applicable' harmless-error analysis—i.e., the *Watson* 'reasonably probable' standard—and may require reversal of the judgment notwithstanding the strength

---

**12** We observe, however, that the trial court appears to have anticipated *Edwards* in subsequently conducting a hearing to determine whether defendant was competent to represent himself during the trial, despite its finding he was competent to stand trial.

**13** Article VI, section 13 of the state Constitution provides in full: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

of the evidence contained in the record in a particular case." (*People v. Cahill*, *supra*, 5 Cal.4th at p 493.) "[T]he kinds of errors that, regardless of the evidence, may result in a 'miscarriage of justice' because they operate to deny a criminal defendant the constitutionally required 'orderly legal procedure' . . . all involve fundamental 'structural defects' in the judicial proceedings, analogous to those to which the United States Supreme Court referred in its [*Arizona v. Fulminante* (1991) 499 U.S. 279] decision . . . ." (*Cahill*, at pp. 501-502.) We conclude the error under section 1368 in failing to appoint counsel to represent defendant during the mental competency proceedings is "analogous to" a structural error referred to in *Fulminante*: "the total deprivation of the right to counsel at trial." (*Fulminante*, at p. 309.)

With respect to violations of a defendant's Sixth Amendment right to counsel at trial, the United States Supreme Court has held that "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic." (*Holloway v. Arkansas* (1978) 435 U.S. 475, 489.) The high court presumes a violation of the right to counsel had a prejudicial effect on the trial "where assistance of counsel has been denied entirely or during a critical stage of the proceeding. When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." (*Mickens v. Taylor* (2002) 535 U.S. 162, 166; see also *Arizona v. Fulminante*, *supra*, 499 U.S. at pp. 309-310 [describing the deprivation of counsel as a "structural defect[] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards" and observing that the "entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant . . ."].) Thus, such a violation is not subject to harmlessness review under *Chapman v. California* (1967) 386 U.S. 18, 23-24, whereby the

39

People are provided an opportunity to prove beyond a reasonable doubt that the constitutional error did not contribute to the verdict.

In limited situations, however, where the denial of counsel was for a discrete time or hearing only, the high court has recognized that the rule of automatic reversal is inappropriate. In such circumstances, the denial of the right to counsel, even during a critical stage in a capital case, does not require automatic reversal but is instead subject to harmless error review. *Satterwhite v. Texas* (1988) 486 U.S. 249 illustrates this point. In *Satterwhite*, a capital case, the defendant's right to counsel was violated by the admission of testimony of a psychiatrist who had examined the defendant without prior notification to the defendant's attorney, in violation of the rule in *Estelle v. Smith* (1981) 451 U.S. 454. Rather than reverse the judgment, the high court distinguished between violations of the right to counsel that "pervade the entire proceeding" and those having the more limited effect of leading to the erroneous admission of evidence at trial. Harmless error review is precluded in the case of pervasive violations, but such review is permitted—even in capital cases—in the latter circumstances because "a reviewing court can make an intelligent judgment about whether the erroneous admission of [the evidence] might have affected [the jury]." (*Satterwhite*, at p. 258.)

The high court reiterated this distinction in *Arizona v. Fulminante*, explaining that "[t]he common thread connecting [the circumstances in which harmless error review is to be applied] is that each involved 'trial error'—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." (*Arizona v. Fulminante*, *supra*, 499 U.S. at pp. 307-308.) The court then contrasted such "trial errors" with those "constitutional deprivations [constituting

40

a] structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. 'Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " (*Id.* at p. 310.)

Here, defendant was completely deprived of the assistance of counsel at a critical stage of the trial proceedings in violation of section 1368. As with a pervasive Sixth Amendment violation, the statutory violation here cannot be likened to "trial error" akin to that at issue in *Satterwhite v. Texas*, *supra*, 486 U.S. at pages 258-259. We cannot simply excise some item of evidence in order to "make an intelligent judgment" (*id*. at p. 258) about whether the competency determination might have been affected by the absence of counsel to represent defendant. There are, in fact, myriad possible strategic choices counsel might have made that could have affected the outcome, for example, by choosing a defense expert different from the expert defendant chose, asking for a third expert to break the tie between the two experts already consulted or, most notably, declining to submit the matter for the trial court's determination based on the written reports and instead demanding defendant's competence be tried to a jury. (Cf. *Rose v. Clark* (1986) 478 U.S. 570, 579, fn. 7 [observing that structural errors affect the very composition of the record and harmlessness review would require "difficult inquires concerning matters that might have been, but were not, placed in evidence"].) In addition, the evidence presented regarding defendant's competence was conflicting. Attempting to assess the effect of the absence of counsel on the trial court's finding of competence is, in truth, no different than attempting to assess the effect on a jury's final verdict of the absence of counsel during a trial on substantive charges: there is no reasoned manner in which to do so because the lack of true adversarial testing denied defendant the basic

41

procedure by which his competence should have been determined. (See *id.* at p. 578, fn. 6; see also *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 150 [stating a violation of a defendant's Sixth Amendment right to counsel of choice carries " 'consequences that are necessarily unquantifiable and indeterminate, [and therefore] unquestionably qualifies as "structural error" ' "]; *Neder v. United States* (1999) 527 U.S. 1, 8-9 [structural errors such as the complete denial of counsel "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair' "].)

We also reject the People's assertion that subsequent competency-related proceedings the trial court conducted rendered the error harmless. As we have explained, allowing defendant to represent himself in the competency proceedings was akin to structural error, rendering the result of the proceedings—the finding that defendant was mentally competent to stand trial—unreliable. But even assuming subsequent proceedings during a trial could in some circumstances remedy this type of error, in this case the trial court's actions following the tainted proceedings did not do so. The trial court did not again declare a doubt regarding defendant's mental competence, suspend trial proceedings, and initiate formal competency proceedings under the statutes. The People point to the hearing on August 2, 1994, at which the trial court considered whether defendant should be permitted to continue to represent himself, and during which the doctors who had previously examined defendant testified. That hearing, however, was not focused on defendant's mental competence *to stand trial*. In any event, because defendant again represented himself at the hearing (and continued to maintain he was mentally competent), to the extent the hearing shed any light on defendant's

42

competence to stand trial, any finding on that subject would have been as unreliable as the tainted section 1368 proceeding.

Accordingly, we conclude the trial court's failure to appoint counsel to represent defendant at the competency proceedings in violation of section 1368 constitutes a reversible miscarriage of justice under article VI, section 13 of our state Constitution. (Cf. *Holloway v. Arkansas*, *supra*, 435 U.S. at p. 489; *Mickens v. Taylor*, *supra*, 535 U.S. at p. 166.)

### iv. *A limited reversal and remand is the appropriate remedy*

Having concluded reversible error occurred, we consider what aspect of the judgment against defendant must be reversed. Must it be the entire judgment, requiring a new trial of the charges (if defendant presently is competent to stand trial), or may reversal be limited to the trial court's competency finding? Although we find statutory error only, we believe it appropriate to look to analogous constitutional precedents in order to answer the question. Thus, with respect to remedying a violation of a defendant's Sixth Amendment right to the assistance of counsel, the high court provided guidance in *United States v. Morrison* (1981) 449 U.S. 361. While the court acknowledged the seriousness of such violations, it observed its decisions also had "implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests. . . . [¶] Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." (*Id.* at pp. 364-365; see also *Lafler v. Cooper* (2012) 566 U.S. ___, ___ [132 S.Ct. 1376, 1391] [tailoring the remedy to the Sixth

43

Amendment violation at issue].)  Similarly, we have recognized a reviewing court's general authority under sections 1260 and 1262, when remedying reversible error, "to select among several dispositions, including but *not limited to* reversal of the judgment and the granting of a new trial."**14**  (*Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1254-1255.)  For example, when reversible error occurs during the sentencing phase of a criminal proceeding, reversing the judgment as to the sentence only is generally appropriate.  (See, e.g., *People v. Wilson* (2008) 44 Cal.4th 758, 842 [reversing the penalty phase verdict because of the erroneous discharge of a deliberating juror and affirming the guilt phase verdict]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 434 [reversing the penalty judgment only because of the erroneous denial of the defendant's self-representation motion made after conclusion of the guilt phase of the trial]; *People v. Morton* (1953) 41 Cal.2d 536, 542-545 [rejecting the position that deficiency of proof in support of a prior-conviction sentencing enhancement requires full reversal of the judgment and concluding, instead, a limited remand for a retrial of the prior conviction allegation is proper].)

In determining the appropriate remedy in this case, we initially observe what type of error is *not* involved.  This is not a case where we can be sure defendant was tried to conviction while actually mentally incompetent; that is,

---

**14**    Section 1260 provides:  "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."

Section 1262 provides in relevant part:  "If a judgment against the defendant is reversed, such reversal shall be deemed an order for a new trial, unless the appellate court shall otherwise direct."

when "as a result of mental disorder or developmental disability, [he was] unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) That type of substantive error clearly would require reversal of the entire judgment.

Nor does the error at issue involve a procedural constitutional due process violation of the type in which the trial court has failed to hold a hearing despite sufficient triggering evidence showing the defendant might be mentally incompetent. (§ 1368; *Pate*, *supra*, 383 U.S. 375; *People v. Pennington* (1967) 66 Cal.2d 508.) The trial court here properly suspended the trial proceedings for an evaluation of defendant's mental competence, had experts examine him, conducted a competency hearing, and then made a finding on the record that defendant was mentally competent to proceed. Although the trial court violated defendant's statutory right under section 1368 by failing to appoint counsel to represent him during the competency proceedings, this violation is fundamentally different from a trial court's failure to hold a hearing, resulting in a complete failure to address a defendant's competence at the time of trial despite substantial triggering evidence of incompetence. Because the appropriate analysis and course of remedial action in a case of true *Pate* error is complex and subject to debate,[15] we do not express any view on how that error should be remedied. But decisions

_____

[15]    We acknowledged this complexity in *People v. Ary* (2011) 51 Cal.4th 510. (See *id.* at pp. 516-517 [due to the applicability of the law-of-the-case doctrine, the court assumed without deciding that a remand for a retrospective competency hearing was a permissible remedy for *Pate* error]; *id.* at pp. 521-523 (conc. opn. of Werdegar, J.) [noting that whether the failure to assess a defendant's competence to stand trial despite substantial evidence of incompetence can be cured by a retrospective hearing is a "significant and unresolved" issue]; see also *post*, fn. 16 [observing the potentially different treatment of *Pate* error on direct and collateral review].)

45

involving *Pate* error provide a useful starting point for the analysis of whether a complete reversal is mandated or whether a more limited reversal is justified in the instant case.

*Pate* error was once generally considered automatically reversible, requiring a new trial of the charges (were the defendant found competent to stand trial at that time). In *Pate*, having found the failure to hold a hearing violated the defendant's constitutional rights, the high court specifically rejected a proposal to remand the case for a retrospective hearing on the defendant's competence: "It has been pressed upon us that it would be sufficient for the state court to hold a limited hearing as to [the defendant's] mental competence at the time he was tried in 1959. If he were found competent, the judgment against him would stand. *But we have previously emphasized the difficulty of retrospectively determining an accused's competence to stand trial*. [Citation.] The jury would not be able to observe the subject of their inquiry, and expert witnesses would have to testify solely from information contained in the printed record. *That* [*the defendant's*] *hearing would be held six years after the fact aggravates these difficulties*. This need for concurrent determination distinguishes the present case from *Jackson* v. *Denno*, 378 U. S. 368 (1964), where we held that on remand the State could discharge its constitutional obligation by giving the accused a separate hearing on the voluntariness of his confession." (*Pate*, *supra*, 383 U.S. at p. 387, italics added.) The high court echoed this position in *Drope*, *supra,* 420 U.S. at page 183: "The question remains whether petitioner's due process rights would be adequately protected by remanding the case now for a psychiatric examination aimed at establishing whether petitioner was in fact competent to stand trial in 1969 [i.e., six years previously]. *Given the inherent difficulties of such a nunc pro tunc determination under the most favorable circumstances*, see *Pate* v. *Robinson*, 383 U. S., at 386-387. . . , *we cannot conclude that such a procedure would be*

46

*adequate here*. [Citation.] The State is free to retry petitioner, assuming, of course, that at the time of such trial he is competent to be tried." (Italics added.)

This court has treated the failure to comply with section 1368 as also requiring complete reversal and retrial of the charges, most likely because the statutory scheme implements the due process guarantee not to be tried while mentally incompetent. In *People v. Hale* (1988) 44 Cal.3d 531, we stated the error "rendered the subsequent trial proceedings void because the court had been *divested of jurisdiction to proceed* pending express determination of the competency issue" (*id*. at p. 541, italics added), and therefore "[b]ecause the trial court failed to hold a competency hearing pursuant to section 1368 after specifically ordering one, the entire judgment must be reversed" (*id.* at p. 533, italics added, fn. omitted). (See also *People v. Pennington*, *supra*, 66 Cal.2d at p. 521 ["That error requires reversal of judgment here."].) In *Welch*, we concluded that where there is substantial evidence of incompetence and "a full competence hearing is required but the trial court fails to hold one, *the judgment must be reversed*." (*People v. Welch*, *supra*, 20 Cal.4th at p. 738, italics added.)

At some point, however, courts parsed the language of *Pate* and subsequent high court decisions addressing the constitutional violation (like *Drope*, *supra*, 420 U.S. 162) and discerned that the problem of remanding for the limited remedy of conducting solely what has been termed a "retrospective competency hearing" as a remedy for *Pate* error was not *the nature of the constitutional injury itself* but was instead the *inherent difficulty* of making a nunc pro tunc determination of the defendant's mental state. Consistent with this emerging view, this court noted in a 1995 opinion that we need not reach the question whether a remand for a retrospective determination of competence was permissible in the case of *Pate* error. (*People v. Stanley* (1995) 10 Cal.4th 764, 818.) Other states and lower federal courts, however, began permitting such retrospective competency hearings

47

as a permissible remedy. In *Com. v. Santiago* (Pa. 2004) 855 A.2d 682, 693, for example, the Supreme Court of Pennsylvania opined: "[W]e find that the decisions from the high [c]ourt act simply as an admonition that there are inherent difficulties in retrospectively determining a defendant's competency, difficulties that in some cases may be insurmountable. *Drope* and *Pate* do not, however, announce a *per se* rule that such retrospective hearings are forbidden. *We now hold that whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant, such a hearing is permissible*." (Second italics added.)

Similarly, in *Moran v. Godinez* (9th Cir. 1995) 57 F.3d 690, 696, the Ninth Circuit Court of Appeals held that "although retrospective competency hearings are disfavored, [citations], they are permissible whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant." (See also *Odle v. Woodford* (9th Cir. 2001) 238 F.3d 1084, 1089 ["The state court can nonetheless cure its failure to hold a competency hearing at the time of trial by conducting one retroactively."].)[16]

*People v. Ary* (2004) 118 Cal.App.4th 1016, 1030 was the first California case to recognize the limited remand procedure for *Pate* error,[17] as we observed in

---

**16**    We note, however, the Ninth Circuit evidently accepts the permissibility of conducting retrospective competency hearings for *Pate* error only in habeas corpus and other collateral proceedings, while it applies a rule of automatic full reversal in direct criminal appeals. (See *Morris v. U.S.* (9th Cir. 1969) 414 F.2d 258, 259, citing *Meador v. U.S.* (9th Cir. 1964) 332 F.2d 935, 938-939; see also *U.S. v. Taylor* (4th Cir. 1971) 437 F.2d 371, 382, fn. 3 [listing cases distinguishing between direct appeals and collateral review]; but see *U.S. v. Makris* (5th Cir. 1973) 483 F.2d 1082, 1092, fn. 8 [observing that that court had "consistently rejected" the Ninth Circuit's rule of automatic reversal in direct criminal appeals].)

**17**    As noted *ante*, in footnote 15, in a later appeal we accepted this ruling as law of the case and thus did not pass judgment on whether the limited remand

*(footnote continued on next page)*

*People v. Young* (2005) 34 Cal.4th 1149. In *Young*, after stating that where substantial evidence of incompetence is presented " 'and a full competence hearing is required but the trial court fails to hold one, the judgment must be reversed' " (*id*. at p. 1217), we noted in a footnote: "But see *People v. Ary*[, *supra*,] 118 Cal.App.4th [at pp.] 1025-1029 . . . (in some circumstances, a remand may be appropriate and reversal for such error might be unnecessary)" (*Young*, at p. 1217, fn. 16). Since the Court of Appeal's decision in *People v. Ary*, one additional California appellate court has held that, on a showing of feasibility, a limited remand to conduct a retrospective competency hearing can serve as an adequate remedy for *Pate* error. (*People v. Kaplan* (2007) 149 Cal.App.4th 372, 388-389; but see *People v. Murdoch* (2011) 194 Cal.App.4th 230, 239 [declining to remand for a retrospective competency hearing in light of *Young*].)

Although defendant appears to concede that a retrospective competency hearing might in some cases constitute a constitutionally permissible remedy for the failure to appoint counsel in competency proceedings, he contends that, as in *Pate* and *Dusky*, primarily because of the passage of time the only permissible remedy in his case is to reverse the entire judgment and remand for a new trial. (See *Pate*, *supra*, 383 U.S. at pp. 386-387; *Dusky*, *supra*, 362 U.S. at p. 403.) We disagree. Instead, we conclude for the reasons discussed, *post*, that in the circumstances of this case, ordering a limited reversal and remand for the trial court to determine whether a retrospective competency hearing is feasible and, if so, to conduct such a hearing is both appropriate and permissible. In so concluding, we agree with the Court of Appeal's decision in *People v. Robinson*,

---

(*footnote continued from previous page*)

procedure was a permissible remedy for *Pate* error. (*People v. Ary*, *supra*, 51 Cal.4th at pp. 516-517.)

49

*supra*, 151 Cal.App.4th at pages 617-618, to order a limited remand in similar circumstances.

First, as we observed above, we cannot be sure defendant in fact was mentally incompetent to stand trial, which, of course, means he may have been *competent*, and if so there is no infirmity in the judgment against him. An automatic full reversal with a remand for a new trial on the criminal charges would impose severe costs on the justice system in remedying a violation that, while considered a miscarriage of justice in the context of the competency proceedings, might not have affected the guilt and penalty verdicts. In contrast, if it remains possible to give defendant that to which he was entitled at trial—a fair and reliable opportunity to prove his incompetence with the assistance of counsel—a remand to explore the feasibility of a retrospective hearing would appropriately tailor the remedy "to the injury suffered from the . . . violation [without] unnecessarily infring[ing] on competing interests." (*United States v. Morrison*, *supra*, 449 U.S. at p. 364.) In other words, if placing defendant in a position comparable to the one he would have been in had the violation not occurred is possible, and a finding is made that he did not bear his burden to prove he was incompetent to stand trial, we would then have no reason to question the fundamental fairness and reliability of the remainder of the judgment against him. (See *People v. Ary*, *supra*, 51 Cal.4th at pp. 520-521 [in the case of *Pate* error, "[R]equiring a criminal defendant to prove at a retrospective mental competency hearing that he was incompetent when tried earlier does not ' "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." ' "]; *Tate v. State* (Okla.Crim.App. 1995) 896 P.2d 1182, 1188 [inherent in the decision to conduct a retrospective competency hearing in the case of *Pate* error "is the conclusion that the defendant will be placed in a position comparable to the one he would have been placed in prior to the original trial"].) In this sense, a limited

50

remand for the purpose of conducting, if feasible, a retrospective competency hearing is akin to a limited remand to remedy a sentencing error that has not affected the judgment of guilt.

Second, in the circumstances of the error in this case, the "inherent difficulties" in conducting a nunc pro tunc evaluation of defendant's competence to stand trial are potentially reduced compared to those arising in the case of *Pate* error. Here, despite the error in the manner in which the competency proceedings were conducted, the subject of defendant's mental competence actually was reviewed at the time of the trial and contemporaneous evidence specifically addressing that issue presumably still exists. In addition, individuals who formed opinions on defendant's competence based on their observations of his mental state at that time may be available to testify at a retrospective hearing. In contrast, in the circumstances of *Pate* error, where there was substantial evidence of incompetence but no proceedings to develop the record further, there is by definition a shortcoming in the evidence, and the trier of fact at a retrospective competency hearing would have to rely on after-the-fact opinions and evidence in the record (such as the defendant's courtroom behavior) that might only circumstantially assist in determining the defendant's mental state at the time of trial. Although, as the high court observed in *Pate*, the trier of fact at a retrospective competency hearing "would not be able to observe the subject of [its] inquiry" (*Pate*, *supra*, 383 U.S. at p. 387), the factual basis for arriving at a fair and reliable decision in defendant's case is more fully developed than had no competency hearing been held. With the caveats discussed below concerning the necessity of establishing the feasibility of conducting a retrospective competency hearing, we cannot say the only acceptable remedy for the statutory violation in this case is an outright reversal of the entire judgment and a remand for a new trial.

51

Our discussion regarding whether to order a limited remand in *People v. Johnson* (2006) 38 Cal.4th 1096 provides additional support for the conclusion a limited remand is appropriate in the present case. *Johnson* involved the issue of the standard for judging whether, in support of a claim under *Batson v. Kentucky* (1986) 476 U.S. 79, the defendant had made a prima facie showing that the prosecutor had improperly exercised peremptory challenges based on discrimination against prospective jurors. The United States Supreme Court had determined that the standard articulated by the California courts—whether " 'it is more likely than not the . . . peremptory challenges, if unexplained, were based on impermissible group bias' "—was an " 'inappropriate yardstick by which to measure the sufficiency of a prima facie case.' " (*Johnson*, at p. 1098, quoting *Johnson v. California* (2005) 545 U.S. 162, 168.) The high court reversed and remanded the matter "for further proceedings not inconsistent with this opinion" (*Johnson v. California*, at p. 173), and we subsequently considered whether a complete reversal of the judgment for a new trial was required, or if a remand limited to further review of the remaining steps of the *Batson* analysis was appropriate. (*People v. Johnson*, at p. 1099.)**18**

---

**18**    We explained the three-step procedure followed in adjudicating a *Batson* claim as follows: " 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' " (*People v. Johnson*, *supra*, 38 Cal.4th at p. 1099.) The limited remand at issue would be for the purpose of the trial court's conducting steps two and three of the procedure. (*Ibid.*)

52

This court concluded a limited remand was appropriate under federal law, rejecting a number of challenges to the propriety of that remedy, in large part because other courts had undertaken such remedial proceedings, and in doing so the various shortcomings alleged had not proven to be of great concern. We pointed out that the high court had concluded only that improper discrimination " '*may have occurred*,' " not "that discrimination *did* occur." (*People v. Johnson*, *supra*, 38 Cal.4th at p. 1101.) We observed that numerous federal courts had adopted the limited remand procedure for this federal constitutional error, and we concluded that various factors, such as the unavailability of the challenged jurors and the trial court judge, as well as the general passage of time since the trial, would not necessarily make it impossible to conduct a fair hearing. (*Id.* at pp. 1100-1103.) Evidence in the record existed that might assist in the review of the challenges at issue, such as the juror questionnaires and the transcripts of voir dire, and the prosecutor's notes from jury selection might provide additional insight. (*Id.* at p. 1102.) Although it was "certainly possible that due to the passage of time or other reasons, the trial court will find that it cannot reliably determine whether the prosecutor exercised his peremptory challenges in a permissible manner" (*id.* at p. 1103), we were not convinced it would be improper to "at least attempt to have the trial court resolve the matter on remand" (*id.* at p. 1100). Accordingly, we remanded the matter with directions that the trial court "attempt to conduct the second and third *Batson* steps. . . . If the court finds that, due to the passage of time or any other reason, it cannot adequately address the issues at this stage or make a reliable determination, or if it determines that the prosecutor exercised his peremptory challenges improperly, it should set the case for a new trial. If it finds the prosecutor exercised his peremptory challenges in a permissible fashion, it should reinstate the judgment." (*Id.* at pp. 1103-1104.)

The circumstances of *Johnson* are analogous to those of the present case in several important respects.  First, we have concluded only that defendant *might have been* incompetent and was denied a fair opportunity to establish that fact, not that he *was* incompetent.  Second, contemporaneous evidence regarding his mental competence presumably exists.  Third, the passage of time since the trial, while a significant concern, does not necessarily make it impossible for a fair and reliable retrospective competency hearing to be held.  Accordingly, as in *Johnson*, we see no reason not to "at least attempt to have the trial court resolve the matter on remand." (*People v. Johnson*, *supra*, 38 Cal.4th at p. 1100.)  If the trial court determines that conducting a retrospective competency hearing is not feasible, or if a retrospective competency hearing is held at which defendant proves he was incompetent by a preponderance of the evidence (see *People v. Ary*, *supra*, 51 Cal.4th at p. 520), then the only permissible remedy would be to let stand our reversal, subject to defendant's being retried if he is at that time mentally competent to stand trial.  If a fair and reliable retrospective competency hearing can be conducted, and at that hearing defendant fails to prove he was incompetent, the judgment will be reinstated.[19]

### v.  *The feasibility determination*

Before conducting the retrospective competency hearing, the trial court must determine whether such a hearing will be feasible.  What we stated in *People v. Ary*, *supra*, 51 Cal.4th 510, regarding a retrospective competency hearing to remedy *Pate* error is equally applicable here:  "Feasibility in this context means the availability of sufficient evidence to reliably determine the defendant's mental

---

[19]  As discussed in the remaining parts of this opinion, we conclude no other reversible errors occurred during defendant's trial proceedings.

54

competence when tried earlier. In the words of the Oklahoma Court of Criminal Appeals: '[T]he defendant will be placed in a position comparable to the one he would have been placed in prior to the original trial.' " (*Id.* at p. 520, fn. omitted.) In assessing whether a retrospective competency hearing is feasible, the trial court should consider " ' " " '(1) [t]he passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with [the] defendant before and during trial' " ' " (*Ary*, at p. 520, fn. 3), as well as any other facts the court deems relevant. We stress that the focus of the feasibility determination must be on whether a retrospective competency hearing will provide defendant a *fair opportunity* to prove incompetence, not merely whether some evidence exists by which the trier of fact might reach a decision on the subject. In making its feasibility determination, the court must consider the fairness of requiring defendant, who has already established a reversible statutory violation, to prove his incompetence to stand trial in 1994 with the now 18-year-old evidence of his prior mental condition still available to him today. As the United States Supreme Court stated in an analogous situation in *Swenson v. Stidham* (1972) 409 U.S. 224, 229, regarding the process to rectify a constitutional violation retroactively (the failure to provide a judicial determination of the voluntariness of a confession under *Jackson v. Denno*, *supra*, 378 U.S. 368), the remedy provided must be "procedurally adequate and substantively acceptable under the Due Process Clause." (See also *de Kaplany v. Enomoto* (9th Cir. 1976) 540 F.2d 975, 986, fn. 11 ["The threshold question is whether the circumstances surrounding the case permit a fair retrospective determination of the defendant's competency at the time of trial."].) Because of the inherent difficulties in attempting to look back to the

55

defendant's past mental state (see *Pate*, *supra*, 383 U.S. at p. 387), the burden of persuasion will be on the People to convince the trial court by a preponderance of the evidence that a retrospective competency hearing is feasible in this case. (See *Baker v. State* (Ga. 1982) 297 S.E.2d 9, 14; *Tate v. State*, *supra*, 896 P.2d at p. 1187; *Lokos v. Capps* (5th Cir. 1980) 625 F.2d 1258, 1268, fn. 5.)

We further observe that even if the trial court initially determines a retrospective competency hearing is feasible, the trial court may later revisit the issue of the fairness and reliability of the resulting hearing. In other words, our reversal would stand and defendant would be entitled to a new trial if the trial court were to determine in hindsight that, despite its initial feasibility finding, the actual hearing had not met the feasibility requirements set forth in *People v. Ary*, *supra*, 51 Cal.4th at page 520 and footnote 3 (see also text, *ante*, at p. 55).

### c. *Remaining Claims Concerning Competency Proceedings*

Defendant raises several other claims of mental-competency-related error, such as errors occurring during the first section 1368 proceedings and at the second competency proceedings, as well as the trial court's failure to declare a doubt regarding defendant's competence at other times during the trial proceedings. We conclude we need not address defendant's remaining competency claims in light of our reversal of the judgment subject to the initial remedy of a limited remand for a retrospective competency hearing. Ultimately, either our reversal will stand and defendant will be entitled to a new trial, or he will be found to have been competent to stand trial following fair and reliable proceedings.

### 2. *Exclusion of Evidence Regarding Defendant's Alibi*

Defendant presented an alibi defense at trial, arguing he was in court the morning of the murder for a bail reduction hearing in a criminal matter unrelated

to Compton's murder.  The prosecution theorized that defendant could have left court as early as a few minutes past 10:30 that morning, driven home with his mother, and had just enough time to drive to the victim's home nearby, arriving shortly before 11:00 a.m., the approximate time of the murder.  Defendant, by contrast, sought to establish he left court closer to 11:00 a.m., which would have left him no time to commit the crimes.  To support his theory of the case, defendant presented evidence from witnesses who saw him in court that morning.  In addition, defense counsel mentioned the transcript of the proceedings in department 10, Kern County Superior Court, for the morning of July 7, 1991, as a possible aid in establishing that defendant did not leave court that morning until almost 11:00 a.m.  On appeal, defendant contends the trial court violated his statutory and constitutional rights by excluding the transcript.[20]  We conclude

---

[20]     "In this claim and most others on appeal, defendant contends the asserted error or misconduct he raises infringed various of his state and federal constitutional rights to a fair and reliable trial.  What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 . . . , applies in the present case:  'In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances.  In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution.  To that extent, defendant's new constitutional arguments are not forfeited on appeal.  [Citations.]  [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional "gloss" as well.  No separate constitutional discussion is required in such cases, and we therefore provide none.' "  (*People v. Alexander* (2010) 49 Cal.4th 846, 866, fn. 6.)

defendant forfeited this claim because he failed to formally ask the court to admit the transcript into evidence, and he did not object to any limitations the trial court suggested it might impose on the admission of evidence or defense counsel's arguments.

The transcript for department 10, Kern County Superior Court, for the morning of July 7, 1991, contained no obvious indications when certain proceedings began or ended. Defendant initially argued the transcript should be admitted because it would have allowed the jury to deduce how long the overall proceedings took, and then to estimate the time when defendant's case was called and continued. This information, he claimed, would in turn have allowed the jury to estimate the time defendant actually left the courthouse. Following the prosecutor's objection that drawing such an inference would be speculative, the trial court, with the parties' agreement, postponed its ruling on the matter. At the close of the guilt phase, when the subject of the transcript again was raised, defense counsel did not seek to introduce the transcript itself, but instead informed the court the parties had agreed to simply inform the jury of the number of pages in the transcript coming before defendant's final appearance that day. The prosecutor, expressing concern that the defense was attempting to draw the same speculative inference that the size of the transcript represented a particular amount of time having passed, decided to withdraw from the stipulation. Defense counsel then advised the court: "*The only thing I was requesting*, your Honor, is to take judicial notice that the transcript of July 7th is marked numerically beginning on Page 2 and sequentially through Page 60." (Italics added.) The trial court agreed to "take judicial notice of the number of pages but [stated it would not] allow any argument as related to these time factors." Defendant did not object to this limitation on the argument to the jury, and defense counsel's subsequent argument to the jury did not mention the number of pages in the transcript.

58

From this record, that defendant failed to preserve the issue he raises on appeal is clear. Although defense counsel initially sought to introduce the entire transcript into evidence, counsel agreed to discuss the matter with the prosecutor rather than having the trial court rule on the request at that time. Counsel ultimately declined to renew his original request to introduce the entire transcript, but instead asked the court to take judicial notice of the number of pages it contained, which the court agreed to do. Contrary to defendant's assertion on appeal, defendant never clearly advised the trial court that he sought to introduce or argue matters beyond that which the court had allowed, and why doing so would be proper. Nor did he argue below that the trial court was required to admit the transcript as a matter of law, or that the court had unfairly allowed other witnesses to testify as to some matters relating to the transcript. As we stated in *People v. Valdez* (2004) 32 Cal.4th 73, 109, "we cannot hold the trial court abused its discretion in rejecting a claim that was never made."

### 3. *Exclusion of Impeachment Evidence Regarding Prosecution Witness Karen Lehman*

Defendant contends the trial court abused its discretion by precluding defense counsel from impeaching prosecution witness Karen Lehman with both her misdemeanor conviction for assault with a deadly weapon (§ 245, subd. (a)(1)) and her alleged past drug use. Both claims are meritless.

When defense counsel attempted to impeach Lehman with her misdemeanor conviction, the prosecutor objected. The prosecutor conceded a conviction for assault with a deadly weapon involved moral turpitude, but asserted (1) Lehman's misdemeanor conviction was inadmissible under *People v. Wheeler* (1992) 4 Cal.4th 284, 297, which held that a misdemeanor conviction is inadmissible hearsay when offered for impeachment purposes, and (2) the court should exclude any evidence concerning the conduct underlying the conviction

59

under Evidence Code section 352.[21] The prosecutor also proposed as a fallback position that "if the court rules against me, allows impeachment, I'll stipulate that . . . on February 6th, 1992, Karen Lehman assaulted Vaughn Lehman with a rock." Defense counsel, agreeing with the prosecutor's description of the underlying conduct, did not attempt to explain further how this evidence could impeach Lehman's credibility. The court excluded the conviction itself under *Wheeler* and the underlying conduct under Evidence Code section 352.

We review a court's ruling under Evidence Code section 352 by applying an abuse of discretion standard. (*People v. Mills* (2010) 48 Cal.4th 158, 195.) "This discretion allows the trial court broad power to control the presentation of proposed impeachment evidence ' " 'to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' [Citation.]" ' " (*Ibid*.) Here, evidence of Lehman's misdemeanor conduct—striking her ex-husband with a rock during a dispute—does not strongly demonstrate moral turpitude, i.e., a " 'general readiness to do evil' " (*People v. Castro* (1985) 38 Cal.3d 301, 315), and thus would not have provided the jury much assistance in assessing Lehman's credibility. "This was a routine matter of weighing the evidence's probative value against the probability its admission would 'necessitate undue consumption of time' (Evid. Code, § 352), and the trial court's ruling was both reasoned and reasonable." (*Mills*, at pp. 195-196.)

---

**21**     "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Nor did the trial court err in precluding defendant from impeaching Lehman with her past drug use. During cross-examination, Lehman testified she did not recall the details of various events. At one point, defense counsel asked her, "Have you taken any drugs today?" After she answered no, counsel asked, "When was the last time you used drugs?" Lehman replied, "Oh, gosh, I don't remember. It's been a long time." Counsel then asked, "Have you found that the use of drugs has affected your memory?" Lehman answered, "No. I would say I haven't had a good memory since I can remember, which hasn't been a long time ago." The prosecutor then asked to be heard and, outside the presence of the jury, objected to the line of questioning concerning Lehman's past use of drugs on the ground of irrelevance. In response to the court's request for an offer of proof, defense counsel stated the view that drug use could affect a witness's perception and memory, that an individual other than defendant had provided counsel information concerning Lehman's supposed drug use, but that counsel did not plan on calling the individual as a witness. The trial court ruled that questions about Lehman's drug use were improper and stated it would admonish the jury to disregard the questions and testimony but, at the prosecutor's request, agreed not to strike the testimony, and the cross-examination continued.

Because defense counsel never made an offer of proof concerning what other evidence regarding Lehman's supposed drug use could have been admitted and, indeed, even declined to identify the potential witness who might have offered such evidence, the trial court did not abuse its discretion by foreclosing further questioning on the subject. (See *People v. Thornton* (2007) 41 Cal.4th 391, 448 [concluding no abuse of discretion occurred when "[c]ounsel made no offer of proof, did not attempt to lay any factual foundation for the view she expressed, and was not speaking on a subject on which judicial notice could be taken."].)

61

#### 4. *Exclusion of Evidence Regarding Defendant's Statements Concerning the Firearms*

During presentation of his defense, defendant sought to introduce testimony from Beverly Westervelt and Dutler Dauwalder that defendant had told them he had purchased the victim's firearms and other belongings from a person who was staying at a house across the street from defendant's mother's house. Defense counsel argued Westervelt's and Dauwalder's evidence was admissible despite the hearsay rule because it constituted an admission by a party, a declaration against penal interest, and an expression of defendant's state of mind. The trial court rejected these arguments and excluded the testimony. Defendant contends the trial court violated his federal constitutional rights to due process and compulsory process by applying the statutory hearsay rule in an improperly "mechanistic" manner. We conclude defendant forfeited this claim and, in any event, it lacks merit.

Although defendant now argues Westervelt's and Dauwalder's testimony was admissible under the federal Constitution irrespective of whether their evidence qualified under an exception to the state's hearsay rule, defense counsel did not make this argument at trial. Nor is the claim merely a "gloss" on the grounds he raised in the trial court. (Cf. *People v. Boyer*, *supra*, 38 Cal.4th at p. 441, fn. 17 [appellate claims are not forfeited if they "merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution"].) Accordingly, he failed to preserve this issue for appeal. (*People v. Ervine* (2009) 47 Cal.4th 745, 779.)

In any event, defendant's claim is without merit. In *Chambers v. Mississippi* (1973) 410 U.S. 284, upon which defendant primarily relies, the high court held the exclusion of testimony regarding a third party's confession to the

62

crime for which the defendant was being prosecuted violated the defendant's constitutional right to present witnesses in his own defense.  In the court's view, "[t]he testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest.  That testimony also was critical to Chambers' defense.  In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."  (*Id.* at p. 302; see also *Chia v. Cambra* (9th Cir. 2004) 360 F.3d 997 [following *Chambers*]; *Tinsley v. Borg* (9th Cir. 1990) 895 F.2d 520 [same].)

The instant case is distinguishable from *Chambers* and its progeny both because defendant's alleged statements to Westervelt and Dauwalder did not bear persuasive assurances of trustworthiness akin to typical declarations against penal interest, and because the statements were not critical to his defense.  Far from being trustworthy, defendant's statements were self-serving and inherently suspect.  Defendant could not reasonably dispute he possessed Compton's firearms and other belongings.  The mere circumstance that, in confirming to his friends that he possessed the victim's firearms, he might have subjected himself to criminal liability for a less serious offense than murder (that of being a felon in possession of firearms) did not necessarily render the statements trustworthy.  That defendant supposedly made these statements before he was formally charged with Compton's murder does not mean they were made when he had no motive to lie.  One might easily surmise defendant anticipated the police might someday learn of his possession of the items and he therefore attempted to plant these statements as a way to throw off suspicion that he had committed the murder.  The statements simply were not "well within the basic rationale of the exception for declarations against interest." (*Chambers v. Mississippi*, *supra*, 410 U.S at p. 302; see *People*

63

*v. Elliot* (2005) 37 Cal.4th 453, 483 [the defendant's statements in a letter that he was "intoxicated" and "just 'snapped' " when he killed the victim "plainly come across as exculpatory rather than inculpatory in light of the defendant's prosecution for first degree murder"].)

Moreover, neither Westervelt's nor Dauwalder's testimony concerning defendant's statements was critical to the defense. Defendant himself was available to testify as to how he obtained the victim's belongings. It has long been the law that a defendant cannot make himself or herself " 'unavailable' " for purposes of the statutory hearsay provisions by exercising a privilege not to testify at trial. (*People v. Elliot*, *supra*, 37 Cal.4th at p. 483; *People v. Edwards* (1991) 54 Cal.3d 787, 819.) Although defendant might have been placed in the position of being forced to decide between exercising his constitutional right to testify and his opposing right to remain silent, "[a]s we have observed, ' "The criminal process . . . is replete with situations requiring the 'making of difficult judgments' as to which course to follow. [Citation.] Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." ' [Citations.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 153.)

In sum, the high court's decision in *Chambers v. Mississippi*, *supra*, 410 U.S. 284, did not obligate the trial court to allow defendant to present evidence of his own hearsay statements as a means to, in effect, testify without subjecting himself to cross-examination. (See *People v. Edwards*, *supra*, 54 Cal.3d at p. 820.) The trial court's decision to exclude the testimony concerning defendant's statements did not violate his constitutional rights.

64

## 5. *Eliciting Testimony Regarding Defendant's Imprisonment*

Before the trial began, the trial court granted defendant's request and directed the prosecutor not to elicit evidence that defendant was incarcerated in prison. Instead, references to defendant's custodial status were to be couched in the more generic term of his being "in custody." At trial, during Beverly Westervelt's testimony concerning her contacts with defendant after he went "into custody on August 12, 1993," the prosecutor asked her if, after visiting him one time "at Lerdo," defendant then was "transferred to Wasco." Westervelt agreed. Later, when questioning her about a letter from defendant, the prosecutor asked Westervelt whether the "return address is Wasco." She once again agreed. At this point defense counsel, outside the presence of the jury, expressed his concern that the references to "Wasco" were improper because counsel believed "the only thing in Wasco is a state prison." After the court observed that defense counsel had not objected when Wasco had been mentioned, counsel moved for a mistrial. The court denied the motion, stating its view that there was nothing "so prejudicial [in] the reference to Wasco [that] it would be a basis for a mistrial. As I pointed out before, . . . [t]here's a lot of places in Wasco. We know that the defendant was writing these letters from someplace in custodial status." The court offered to instruct the jury to disregard the references to Wasco, but defense counsel declined.

The following day, defense counsel renewed the motion for a mistrial, asserting that the references to Wasco implied "that [defendant] has a felony conviction, and it's a way of impeaching [him] without him having to take the stand." The trial court again expressed its view that any possible prejudice arising from the references to Wasco was insignificant.

Later, during the testimony of the informant Robert Rowland, the prosecutor asked whether, because Rowland had testified as an informant in other

65

cases, he was serving his "thirteen year sentence" in "some type of protective housing unit." Rowland confirmed this was true. He subsequently testified that for approximately one month at the end of 1993 to the beginning of 1994 he was housed with defendant in a correctional facility in Kern County. During this time, according to Rowland, defendant confessed to having killed an old man for his guns. Defendant did not object to this portion of the testimony.

Defendant contends these references, contrary to the trial court's pretrial order, informed the jury that he was not merely "in custody," but was imprisoned, and therefore was a convicted felon. He asserts that the prosecutor committed misconduct by eliciting this information and that the trial court abused its discretion by denying his motion for a mistrial. Both claims lack merit.

The law is settled. A prosecutor's behavior does not violate the federal Constitution unless his or her actions comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law. Short of rendering the trial fundamentally unfair in the federal sense, the prosecutor's actions may still violate the state Constitution if he or she engaged in deceptive or reprehensible tactics in order to persuade the trier of fact to convict. (*People v. Abilez* (2007) 41 Cal.4th 472, 494.)

As the trial court explained, the prosecutor's questions referencing the town of Wasco as defendant's place of residence, and Westervelt's confirmation, were vague, as defendant may have been in custody somewhere in the town of Wasco other than in Wasco State Prison. Moreover, any possible prejudice was minimal, as the jury already knew defendant was "in custody" somewhere. While it might have been better for the prosecutor to have refrained from such questions, we cannot conclude such questions constituted an egregious pattern of misconduct or that defendant's trial was rendered fundamentally unfair as a result.

Defendant's claim that the court abused its discretion by denying his motion for a mistrial on this ground fares no better. " ' "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." ' " (*People v. Lucero* (2000) 23 Cal.4th 692, 713-714.) Accordingly, "[w]e review a trial court's denial of a motion for mistrial for abuse of discretion." (*People v. Williams* (1997) 16 Cal.4th 153, 251.)

Regarding the references to "Wasco" during Westervelt's testimony, we cannot conclude the trial court abused its broad discretion in ruling that a mistrial was not warranted. (*People v. Panah* (2005) 35 Cal.4th 395, 453 [a trial court is obligated to declare a mistrial only when there has been irreparable damage to a party's chance of receiving a fair trial].) Defendant asserts that Wasco "is a nearby California State Prison located in Kern County and well-known to Kern County residents including jurors in this case." There is, however, no evidence in the record establishing that the *only* correctional institution in Wasco is a state prison or that any juror in this case would have believed that was the case. Nothing in the record contradicts the trial court's view that there were "a lot of places in Wasco," and therefore these references would not have prejudiced the jury against defendant.

To the extent he makes the same claims with regard to Rowland's testimony, defendant did not object or move for a mistrial based on asserted prosecutorial misconduct in violating the trial court's order. Accordingly, defendant forfeited this aspect of his claim. (*People v. Riggs* (2008) 44 Cal.4th 248, 298.) The trial court would not in any event have been obligated to declare a mistrial had defendant requested one. Rowland did not testify that defendant and he were housed together in a protective unit in a prison. Accordingly, there is no

67

likelihood the jury, who were not lawyers familiar with custodial arrangements, would have inferred from Rowland's testimony that defendant was not merely "in custody," but was imprisoned. Rowland's testimony did not irreparably damage defendant's chance of receiving a fair trial, and granting a mistrial therefore was not appropriate.

### 6. *Refusal to Give Defendant's Proposed Instruction Concerning Alibi Defense*

Defendant requested a special instruction informing the jury: "Where it is claimed that the defendant was not at the scene at the time the alleged crime was to have been committed, the defendant is not required to prove the alibi beyond a reasonable doubt or by a preponderance of the evidence, rather the prosecution has the burden to prove beyond a reasonable doubt the defendant was present on the premises when the crime was committed." Defendant asserted that CALJIC No. 4.50—the standard jury instruction regarding an alibi defense the trial court intended to give the jury—did not adequately explain that defendant did not bear the burden of proving the truth of his alibi.[22] The trial court rejected defendant's proposed instruction, finding it potentially confusing and that it did not "say[] anything more than what CALJIC 4.50 says."

Before the court instructed the jury at the close of the guilt phase, defense counsel renewed his request, this time buttressed by citations to cases purportedly supporting the proposed special instruction. After a recess during which the court

---

[22] CALJIC No. 4.50, as was given in this case, provided: "The defendant in this case has introduced evidence for the purpose of showing that he was not present at the time and place of the commission of the alleged crime for which he is here on trial. If after consideration of all the evidence, you have a reasonable doubt that the defendant was present at the time the crime was committed, you must find him not guilty."

examined those decisions, the court again rejected the instruction because it "would at least imply . . . that there is some burden on the defendant to do something, even though [he] may not be required to prove the alibi beyond a reasonable doubt," and the court did not "want the jurors to think that the defense has the burden to prove anything." The court stated: "If the alibi [the defense submits] raises a reasonable doubt regarding the defendant's presence at the scene of the crime, then the jurors would have to find the defendant not guilty of the offense, otherwise there would be a reasonable doubt in their mind[s] in that regard. [¶] So I think it's superfluous, it's redundant, and it's confusing."

Defendant contends the proposed special instruction was a proper "pinpoint instruction" regarding his alibi defense, and the trial court's refusal to give the instruction to the jury violated his statutory and constitutional rights. We rejected a similar claim in *People v. Richardson* (2008) 43 Cal.4th 959, 1026. In that case, we concluded the trial court did not err by rejecting a modification of CALJIC No. 4.50 that, like defendant's proposed special instruction, attempted to emphasize the defendant bore no burden to prove his alibi.[23] We stated the modification "went far beyond emphasis and strayed into the argumentative," and, in light of "other instructions relating to reasonable doubt, such as CALJIC No. 2.90, it was properly rejected as repetitious." (*Richardson*, at p. 1026.) Defendant's proposed special instruction was similarly argumentative and

---

[23]    The proposed instruction in *Richardson* was similar to that proposed by defendant here and would have added the following sentences after the first sentence of CALJIC No. 4.50: " 'The burden of proof is always on the prosecution. It never shifts to the defendant. The defendant is not required to prove beyond a reasonable doubt or even by a preponderance of the evidence that he was not present at the time and place of the commission of the alleged crimes.' " (*People v. Richardson*, *supra*, 43 Cal.4th at p. 1026, italics omitted.)

repetitious in light of the trial court's other instructions.  In addition, the absence of the proposed instruction did not preclude defendant from arguing to the jury that, in light of his alibi evidence, the prosecution had failed to prove his guilt beyond a reasonable doubt.  The trial court did not err by refusing to give the proposed instruction.

### 7.  *Absence of Instruction to the Jury at the Guilt and Penalty Phases Regarding Restraints*

Based on information from jail staff concerning defendant's behavior while in custody, the trial court ordered defendant physically restrained during the trial by means of leg irons and a waist belt attached by a chain to an eyebolt in the floor under the defense table.  The restraints were hidden from the jury's view by a shroud around counsel's table, and the chain connecting defendant to the floor was wrapped in tape to prevent it from making sounds when defendant moved.  The court further explained that, if defendant testified, his chains would be removed and he would be placed in the witness chair outside the presence of the jury.

Defendant contends the trial court erred by failing on its own motion to instruct the jury with CALJIC No. 1.04, at both the guilt and penalty phases, concerning its duty not to consider the circumstance that defendant was physically restrained while in the courtroom.[24]  This claim fails because there is no factual support in the record for the necessary preliminary finding that any juror was

---

**24**    CALJIC No. 1.04 provides:  "The fact that physical restraints have been placed on defendant [_____] must not be considered by you for any purpose. They are not evidence of guilt, and must not be considered by you as any evidence that [he] [she] is more likely to be guilty than not guilty.  You must not speculate as to why restraints have been used.  In determining the issues in this case, disregard this matter entirely."

aware of defendant's physical restraints. Defendant's citations to various mentions of the restraints by the court and counsel, primarily made during the pretrial proceedings, in no way establishes that, despite the trial court's precautions, the jury was aware of the restraints during the trial. In the absence of any indication in the record that the jury was aware of the physical restraints, or a request from defendant for an instruction on this subject, the trial court did not err by failing to instruct the jury with CALJIC No. 1.04. (*People v. Medina* (1995) 11 Cal.4th 694, 732 ["[N]o sua sponte instruction is required if the restraints are not visible by the jury."].)

## II. PENALTY PHASE AND POSTTRIAL

### A. Facts

#### 1. *Prosecution Evidence*

The prosecution presented evidence of four incidents involving assaultive conduct by defendant. Beverly Westervelt testified that on December 17, 1990, she and defendant were living together in her apartment, and defendant came home very early in the morning after being out all night. Defendant became enraged when Westervelt asked him where he had been and hit her with an ironing board, grabbed her by her neck and dragged her across the room, and punched her in the chest. Defendant later apologized, but told her that if he had wanted to hurt her, he could have "put his fist right straight through" her. Westervelt's chest hurt for several days, and she eventually went to the hospital, although an X-ray examination disclosed no injury requiring treatment.

John Turner testified that on the night of December 5, 1991, he was at a nightclub in Bakersfield and defendant would not let Turner pass him when Turner was on his way to the bar. Defendant challenged Turner to go outside, and Turner agreed. On the way out of the bar, Turner, who was walking in front of defendant,

71

was struck and rendered unconscious. When he regained consciousness, his lip and chin were bleeding; his chin was permanently scarred. Approximately two weeks later, defendant came to Turner's apartment and apologized for hitting him at the nightclub. Defendant asked Turner not to press charges, and Turner agreed.

A prison corrections officer testified that on November 12, 1993, at Folsom State Prison, defendant and another inmate engaged in a fistfight in a cellblock. Defendant refused to attend the resulting disciplinary hearing and was found to have violated prison rules by fighting. The disciplinary charges against the other inmate were dismissed, which indicated he had been acting in self-defense during the fight.

A detention officer in the Kern County Jail testified that on April 2, 1995, he saw an extra set of jail clothing in defendant's cell, which was a violation of jail regulations. The officer entered the cell and directed defendant, who was lying on his bed, to stand up and face the wall so the officer could search the bed for other contraband. Defendant did not immediately comply, and the officer repeated his command. Defendant eventually got up but, contrary to the officer's orders, turned toward the officer and "squared up," clenching his fists by his side. Interpreting defendant's actions as "combative," the officer restrained defendant in a "wrist lock," placed him prone on the floor, handcuffed him and, pursuant to standard procedures when a detainee has been restrained in this manner, took him to the jail's infirmary.

The prosecution also introduced records of defendant's three prior felony convictions, for possession of amphetamine for sale and for possession of marijuana for sale, both occurring in 1976, and for possession of cocaine in 1987.

Finally, the prosecution presented the testimony of Compton's nephew, Anthony Compton, regarding the murder victim's characteristics, activities, and hobbies. Although his uncle had been diagnosed with serious cancer, Anthony

72

testified Compton remained very energetic and enthusiastic, and never gave up hope. About a week before the murder, he told Anthony that "everything was looking good."

## 2. *Defense Evidence*

Against the advice of his defense attorneys, defendant testified at the penalty phase, mostly to dispute the veracity of the guilt and penalty phase evidence presented against him. Defendant claimed that most of the prosecution witnesses had lied, and maintained he could not have committed the murder because the court proceeding he had attended on the day of the murder began in the morning and lasted all day, until 5:45 that evening. He claimed the reporter's transcript and the telephone records indicating otherwise were fraudulent and had been doctored as part of a conspiracy against him. Although defendant admitted he had possessed the victim's guns and belongings, he contended he purchased all the items on July 17, 1993, from a person who was staying at a house across the street from his mother's house. After he learned of the murder by reading Compton's obituary, defendant realized he had purchased the victim's belongings, but did not contact the police because he was afraid the person who had sold him the items might retaliate, or the police would charge him with possession of stolen property or being a felon in possession of firearms. According to defendant, before he was arrested for Compton's murder, he told several people he had bought the items. Defendant denied he threatened to harm Karen Lehman if she told anyone about the guns.

Defendant testified that in the three incidents in which he was accused of assaulting Westervelt, Turner, and the prison inmate, he was only responding to the other person's aggressive actions. As to the incident in his jail cell, he claimed he had complied with the detention officer's order to stand and face the wall, but

73

the officer nonetheless grabbed defendant's hand, pushed him to the floor, kicked him in the ribs, and handcuffed him. According to defendant, the officer broke bones in defendant's hand and several of his ribs, and the medical records from the incident, which did not indicate such injuries, were forgeries. Defendant admitted his prior convictions, but largely denied he had committed the crimes or minimized their significance. He acknowledged that his probation for one of the charges had been revoked based on subsequent charges he had molested a student at a school where he was teaching. Although defendant had been acquitted of those charges, he claimed his probation nonetheless was revoked because he had refused to admit he was a sex offender when he was not. He also denied he committed the subsequent molestation of which he was accused, which was related to the court proceeding on the day of the murder. He said he ultimately pleaded no contest to the charges in order to receive a greatly reduced sentence.

Defendant also recounted his difficulties with the various attorneys who represented him in the early stages of these proceedings. In defendant's view, his defense attorneys were working with the prosecution to convict him, and the prosecutors and court employees involved in his case were biased against him.

Defendant also discussed his personal and family history, including his having graduated from the California State University at Bakersfield and having been gainfully employed by several large companies. Defendant said his relationship with Beverly Westervelt generally was peaceful. He had purchased a house for them to live in and provided other support for her and her two children. Other than the incident that had been brought up at trial, there had never been physical altercations between them. Defendant described his relationship with his father as their being "best friends," although his father was a strict disciplinarian. In 1978, defendant's father committed suicide by shooting himself with a shotgun, and defendant was the one who had found the body.

74

Defendant's older brother, Richard Lightsey, who was a minister in the Episcopal Church, also testified concerning defendant's family life. Richard described two instances in which their father had physically attacked their mother. After the first attack, their father moved to a separate room in the house and began starving himself, which eventually resulted in his being hospitalized for malnutrition and scurvy. Later, after the second attack, their mother moved out of the house. Richard came to his father's house the day his father committed suicide and saw defendant crying hysterically and banging his head and arms against a wall. According to Richard, after defendant was released from prison following his cocaine possession conviction, he seemed to be quite successful in getting his life back on track, as he obtained gainful employment and bought a house. The subsequent molestation charges greatly upset defendant because his progress in reestablishing his life was placed in jeopardy. Defendant was very focused on proving his innocence of the molestation.

Clinical Psychologist William Pierce interviewed defendant and several of his family members and reviewed various records related to this case, including the reports of the three experts who had previously evaluated defendant's competence to stand trial. Dr. Pierce opined defendant suffered from a severe emotional disturbance, with paranoid, persecutory, delusional, and narcissistic personality disorders and depressive characteristics involving a sense of hopelessness and despair. Defendant, however, had refused to participate in a suggested series of clinical psychological tests to further evaluate his personality and the possibility of any organic impairment of his central nervous system.

Although defendant described his childhood to Dr. Pierce as positive and happy, the other members of his family presented a less cheerful situation, mainly revolving around the violent behavior of the father. The family members reported that at one point the father stated he had a religious vision and believed he had

75

magical powers and would not die.  Unlike other members of the family, defendant appeared to accept his father's beliefs as rational, and although defendant acted as though everything was fine after his father's suicide, he actually was denying his feelings as a way to minimize his emotional problems. Dr. Pierce believed defendant's suppression of his true feelings about his father's death fostered his distorted view of the world, including his feelings of persecution.  Defendant's psychological problems had been present for several years and might have affected his thinking at the time of the murder.  In Dr. Pierce's opinion, a sentence of life without the possibility of parole would curb defendant's criminal behavior.  His personality disorders could be treated, but successful treatment might be difficult.

## B.  Issues

### 1. *Limitations on Dr. Pierce's Penalty Phase Testimony*

Defendant contends the trial court erred by limiting the penalty phase testimony of his psychiatric expert, Dr. Pierce, in two respects.  As we explain, neither claim has merit.

During his penalty phase testimony, defendant discussed his difficulties with his previous attorneys and mentioned there had been delay in the proceedings while his competence to stand trial was evaluated.  The prosecutor objected to further testimony regarding the earlier competency proceedings on the ground such testimony would be irrelevant.  Defense counsel explained the evidence of defendant's competency evaluations was intended to address section 190.3, factor (d), concerning "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." Counsel advised the court he intended to "lay the foundation [for the reports] through [defendant] and then take that matter through Dr. Pierce when he

76

testifies." Referring to the three mental health experts who had previously examined defendant in connection with the two earlier competency hearings, defense counsel clarified he was "not going to call [any of those doctors] as a witness and I'm not going to give the doctors' conclusion." In response to the prosecutor's continuing objection, defense counsel stated, "*I don't plan to ask Dr. Pierce what was in those reports.* I'm going to ask Dr. Pierce if he read those reports, . . . and I'm going to ask him if he relied on those reports partially in forming his opinion. . . . [¶] *I'm not going to ask what these doctors said.*" The trial court thereafter stated: "I don't have any problem with your making an inquiry as to whether or not he was evaluated by those doctors. And if at some point in time you're going to call Dr. Pierce to come in here and testify that, amongst other things, in addition to his education, in addition to his experience, he's going to rely upon the reference to the reports previously made by Dr. Velosa, Dr. Burdick and Dr. Manohara and stops at that, I don't have any particular problem with that and I don't think the People do." The prosecutor agreed. Defense counsel then proceeded to question defendant concerning his meetings with the psychiatrists.

Later, during the direct examination of Dr. Pierce, defense counsel asked whether Dr. Pierce had made "some psychiatric evaluations," and he replied, "No, I didn't, but I read some." Dr. Pierce then continued: "There were other psychiatric evaluations, reports that were done by other psychiatrists that I read subsequent to my coming to an opinion, and he was evaluated by these psychiatrists [in] July 1994 for a couple of reasons. One—." At this point the prosecutor objected, and the trial court reminded counsel of its earlier ruling. Defense counsel explained his intention was "the doctor was going to explain that he read these psychiatric evaluations as part of the foundation for arriving at his conclusion." The trial court reminded counsel this "was to be a general

77

reference," and counsel agreed to "be general." Counsel then asked Dr. Pierce: "And after having read these reports and having read all the other material provided to you, having had your interviews with members of the family and [defendant], did you come to a professional opinion as to [defendant's] personality?" Dr. Pierce stated he had reached a conclusion and then proceeded to explain it to the jury.

Defendant contends the trial court improperly limited Dr. Pierce's testimony regarding his evaluation of the reports of the three psychiatrists. As the record demonstrates, however, defendant did not seek to have the trial court admit into evidence anything more than what it ultimately did admit. Defendant's contention the court erred by excluding testimony concerning the specific contents of the reports of those three doctors lacks merit because he never sought to introduce such testimony at trial. (Cf. *People v. Valdez*, *supra*, 32 Cal.4th at p. 109 [when a defendant on appeal argues a theory of admissibility of evidence not raised at trial, "[W]e cannot hold the trial court abused its discretion in rejecting a claim that was never made."].) Indeed, if defendant actually had been seeking to introduce the opinions expressed in the reports, no reason appears why he could not have simply called those doctors to testify concerning their own evaluations.

Defendant also contends the trial court "abused its discretion by excluding Dr. Pierce's expert opinion regarding whether [defendant's] father's conduct was symptomatic of mental illness around the time of his involuntary commitment to the psychiatric facility at the Kern County Hospital," asserting there is "widespread acknowledgment and 'clear evidence' that genetic influences and a person's background contribute greatly to the etiology of mental illness." The record shows defense counsel first established that defendant's father had been admitted to a psychiatric ward of the Kern County Hospital as a result of some

78

apparently disturbed behavior.  Counsel then asked Dr. Pierce whether he had "an opinion about [the] father's conduct at [the] time [of his hospitalization]."  The prosecutor objected, and the court sustained the objection, advising counsel to "go back to the main theme."  Counsel then asked the doctor whether defendant had "give[n] you any impression of the effect of his father's conduct at this time on him."  Dr. Pierce replied, "[The i]nteresting thing about [defendant's] description of, and relationship with, his father is that he never gave me the indication that this was as bizarre, and what I call psychotic in my opinion, as the other family members," and he then proceeded to discuss the difference in defendant's perception from "the reality that other family members clearly agreed on."

Although defendant now contends the trial court abused its discretion in sustaining the prosecution's objection and excluding Dr. Pierce's opinion about the mental problems of defendant's father, defendant made no offer of proof concerning what Dr. Pierce's testimony on this subject would have been.  We cannot conclude the trial court abused its discretion by sustaining the objection to this question when defendant made no offer of proof at trial explaining why the witness should have been permitted to answer the question.[25]  (Cf. *People v. Whitt* (1990) 51 Cal.3d 620, 648 [even if a trial court has erred in sustaining an objection to a question that is relevant on its face, the reviewing court "must know the 'substance' or content of the *answer* in order to assess prejudice," which requires that "the wording or context of the question makes the expected answer clear, or . . . the proponent of the evidence makes an offer of proof"].)

---

[25]     We also observe that, despite the court's ruling, defendant was, in fact, able to elicit in Dr. Pierce's subsequent testimony that, in his opinion, the father's behavior was "psychotic."

## 2. *Admission of Section 190.3, Factor (b) Evidence Concerning the Incident in Jail*

Defendant contends the trial court erred by admitting, over his objection, testimony concerning the incident in the Kern County Jail in which he failed to comply with a detention officer's commands and then "squared up" to the officer by facing him with his fists clenched at his sides, in what the officer described as a "combative stance," prompting the officer to take him to the floor, handcuff him, and remove him from the cell.  In rejecting defendant's motion to strike this testimony, the trial court agreed with the prosecutor's assertion that, if the jury accepted the officer's testimony, defendant's conduct constituted resisting or obstructing a law enforcement officer in the performance of his duties, in violation of section 148,[26] with an implied threat of force or violence, and therefore the testimony was admissible under section 190.3, factor (b).[27]  In the court's view, "That's a jury question.  They can figure that out themselves, make a determination as to whether or not that conduct which was testified about by [the officer] falls within . . . that category."

---

[26] Section 148, subdivision (a)(1) provides:  "Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined in Division 2.5 (commencing with Section 1797) of the Health and Safety Code, in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

[27] Section 190.3 provides in relevant part:  "In determining the penalty, the trier of fact shall take into account any of the following factors if relevant:  [¶] . . . [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

On appeal, defendant asserts his behavior constituted merely a failure to respond to the officer's orders with "alacrity," not resistance or obstruction, and his "passive actions" did not involve violence. We agree with the trial court, however, that the jury could reasonably find from the officer's testimony that after the officer found contraband in defendant's cell, he tried to search the cell for other improper items, but defendant only reluctantly complied with his orders to move from his bed and then assumed a threatening stance, which the officer viewed as combative. As a result of these actions, the officer could not at that time complete the search of defendant's cell, but instead determined it was necessary to restrain defendant before the incident escalated. From this, the jury could find the incident constituted obstructing the officer during his lawful duties, and defendant's actions carried an implied threat of violence. (See *People v. Sapp* (2003) 31 Cal.4th 240, 314 [the trial court properly instructed the jury it could consider unadjudicated criminal acts in aggravation "only if they found beyond a reasonable doubt that defendant had committed the act or activity, and that it involved the use or attempted use or express or implied threat to use force or violence"].) Accordingly, we conclude the trial court did not err in admitting this evidence under section 190.3, factor (b).

### 3. *Refusal to Permit Defendant to Address the Jury Before Announcement of the Penalty Verdict*

Defendant contends the trial court erred by denying his request to personally address the jury after the jury announced it had reached a verdict and before the verdict was read in court. This claim lacks merit: "[B]ecause a defendant has the right to testify at the penalty trial, we have repeatedly 'held that the defendant does *not* have the " 'right to address the sentencer without being subject to cross-examination' in capital cases." ' " (*People v. Cleveland* (2004) 32 Cal.4th 704, 766; see also *People v. Evans* (2008) 44 Cal.4th 590, 592-593

81

["California law gives a defendant the right to make a personal statement in mitigation of punishment but only while under oath and subject to cross-examination by the prosecutor."]; *People v. Clark* (1993) 5 Cal.4th 950, 1036-1037 [rejecting due process and equal protection challenges to the rule that capital defendants have no right to make statements in mitigation without being subject to cross-examination].) We reject defendant's request to revisit these decisions.

### 4. *Ruling on the Motion for New Trial*

Defendant moved for a new trial under section 1181, raising several grounds. Section 1181 states in pertinent part that, "[w]hen a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only: [¶] . . . [¶] 5. When the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial, and when the district attorney or other counsel prosecuting the case has been guilty of prejudicial misconduct during the trial thereof before a jury[.]" The trial court denied the motion in its entirety but did not specifically mention two grounds defendant had included in the motion: that a prosecutor previously assigned the case who testified at trial regarding defendant's alibi had committed "misconduct" by testifying untruthfully,[28] and that the trial court erred by denying defendant's section 995 motion to dismiss the charges. Defendant now claims the trial court's failure to reject these claims specifically requires we reverse the judgment and

---

**28** Defendant's motion pointed out that the prosecutor testified at trial that defendant's bail matter in department 10 on the morning of the murder was called for the final time shortly after 10:30 a.m. and concluded a few minutes later, but at the preliminary hearing in the murder case had testified defendant's matter in department 10 concluded about 10:45 that morning.

remand the matter to the trial court with directions to reconsider the new trial motion.

" 'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.' [Citations.] ' "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." ' " (*People v. Thompson* (2010) 49 Cal.4th 79, 140.) In the present case, the trial court denied defendant's new trial motion, stating: "I've had a substantial amount of time to review the pleadings in this matter, in particular addressing the particular matters before the Court right now, which is the motion for new trial. And the Court, of course, heard all the evidence in this case. And through an independent process of evaluating the evidence and the alleged alibi, the Court is not convinced that the motion should be granted. [¶] The verdict was not contrary to the law nor the evidence presented, and it's in light of that *and in light of the review of the various arguments presented here today, along with the written motion* and the written response of the People, the Court's going to deny the motion for new trial."

In light of the trial court's comprehensive statement denying the motion, we presume the court considered and rejected each ground raised in defendant's motion. Defendant's claim is similar to one we addressed in *People v. Lewis and Oliver* (2006) 39 Cal.4th 970. There, a defendant argued the trial court's denial of his new trial motion was "so perfunctory that we cannot be confident that the court properly exercised its discretion, or exercised any discretion at all." (*Id*. at p. 1062.) We rejected the argument, explaining that "[a]lthough the trial court's rejection of [the defendant's] . . . argument was stated succinctly, we infer from the record of the hearing itself that the court properly 'discharge[d] [its] duty to conscientiously consider [the] motion for new trial . . . . The hearing transcript

reveals that [the court] was well acquainted with the briefs and the transcript of the trial and carefully considered those claims before denying the motion.' " (*Id.* at p. 1063.)

The same reasoning applies here. When the trial court denied the new trial motion "in light of [the court's] review of the various arguments presented here today, along with the written motion," we assume the court considered and rejected all grounds defendant raised, including the two grounds defendant now argues were omitted from the court's consideration. Moreover, the court's failure to embellish its ruling by referring to the specific claims included in the motion is not particularly surprising in light of the minimal presentation defendant made below, particularly regarding the claims he now raises on appeal: they were raised only briefly in a conclusory fashion in the written motion and were not orally addressed at the hearing. We therefore conclude defendant has not demonstrated the trial court failed to rule on these grounds.

Although defendant does not specifically address the merits of his new trial motion, we also conclude the court did not abuse its discretion in denying it. As to the claim of prosecutorial misconduct, defendant did not establish that the former prosecutor's testimony at trial, to the extent it might have been inconsistent with his testimony at the preliminary hearing, was false and therefore constituted misconduct. Moreover, even if defendant had established misconduct, he did not establish he was denied a fundamentally fair trial or that a reasonable probability existed he would have obtained a more favorable outcome, especially in light of the fact defense counsel questioned the witness about this possible inconsistency during redirect examination. As to the claim the trial court erred in denying his section 995 motion, the court's finding the evidence at trial was sufficient to prove defendant's guilt rendered moot the challenge to the magistrate's finding of probable cause. (*People v. Crittenden* (1994) 9 Cal.4th 83, 137 ["Where the

evidence produced at trial amply supports the jury's finding, any question whether the evidence produced at the preliminary hearing supported the finding of probable cause is rendered moot."].)

### 5. *General Challenges to the Death Penalty*

Defendant raises a number of challenges to the validity of the California statutes and procedures relating to capital cases. We previously have rejected these claims, and do so again here.

"The set of special circumstances qualifying a first degree murder for capital sentencing (§ 190.2) is not impermissibly broad. [Citation.] Nor is section 190.3, factor (a), under which the jury may consider the 'circumstances of the crime' as a factor in aggravation (or mitigation) of penalty, so broad as to make imposition of a death sentence arbitrary and capricious." (*People v. Moore* (2011) 51 Cal.4th 386, 415.) The range of factual circumstances involved in the murders in which the death penalty has been upheld establishes that the sentencing scheme properly allows for each case to be " ' " 'judged on its facts, each defendant on the particulars of his offense' " ' " (*ibid.*), not that the death sentence is applied in this state in a "wanton" or "freakish" manner.

We also have rejected the argument that various asserted "safeguards" in the sentencing process are constitutionally compelled. Thus, the jury is not required to reach a unanimous verdict or issue a written verdict regarding the existence of aggravating factors. (*People v. Moore*, *supra*, 51 Cal.4th at p. 415.) There is no requirement, even in light of the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 and its progeny, that the jury be convinced beyond a reasonable doubt (1) of the existence of any aggravating factors, (2) that the factors in aggravation outweigh those in mitigation, or (3) that the death penalty is the appropriate sentence. (*Moore*, at pp.

415-416.)  Because the penalty decision is inherently normative, not factual, there is no requirement the jury be instructed regarding the existence or absence of a burden of proof regarding its determination of the appropriate sentence.  (*Id.* at p. 415.)  Nor must the trial court amend the standard jury instruction regarding the sentencing determination, CALJIC No. 8.85, specifically to delete factors the defendant claims are inapplicable, or designate certain factors as mitigating only (*Moore*, at p. 417), or inform the jury that mitigating factors must be considered only in mitigation and the absence of proof of a mitigating factor cannot be considered an aggravating factor (*People v. Gamache* (2010) 48 Cal.4th 347, 406).  The trial court is not required to give additional instructions "to establish a tie-breaking mechanism" regarding the jury's weighing of the applicable factors and its ultimate sentencing decision.  (*Id.* at p. 407.)  " 'The use of the limiting adjectives "extreme" and "substantial" in the instruction on section 190.3, factors (d) [(referring to 'extreme mental or emotional disturbance)'] and (g) [(referring to 'extreme duress' and 'substantial domination' by another)] does not unconstitutionally prevent the jury from considering mitigating evidence.' " (*Moore*, at p. 416.)

"Comparative intercase proportionality review of death sentences is not constitutionally required.  [Citations.]  'Because capital and noncapital defendants are not similarly situated in the pertinent respects, equal protection principles do not mandate that capital sentencing and sentence-review procedures parallel those used in noncapital sentencing.' " (*People v. Moore*, *supra*, 51 Cal.4th at p. 417.)  Defendant's citations to various statistics and other extra-record materials such as death judgment affirmance rates and various law journal articles, even if properly before us, do not establish that our review of defendant's appeal specifically, or of all automatic appeals in general, has been affected by "political considerations,"

resulting in a denial of his right to due process.  (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1140-1141.)

" 'California's use of capital punishment as an authorized sentence for certain specified types of first degree murder does not constitute cruel and unusual punishment merely because most nations have chosen not to employ the death penalty at all.  [Citations.]' " (*People v. Moore*, *supra*, 51 Cal.4th at p. 417.)

### 6. *Cumulative Error*

Defendant contends the judgment should be reversed based on the asserted cumulative effect of the guilt and penalty phase errors he has raised.  Other than the conclusion that reversible (but potentially curable) error occurred when the trial court permitted defendant to represent himself during the competency proceedings, the other errors we have found or assumed were harmless.  Even when considered cumulatively, these other errors do not support a conclusion that defendant was denied a fair trial.

### III.  DISPOSITION

We reverse the judgment and remand to the trial court with directions to determine whether holding a retrospective competency hearing is still feasible.  If it is not, the trial court must set the case for a new trial.  Prior to that trial, the trial court must determine defendant's present competence to stand trial.

If the trial court initially finds a retrospective competency hearing is feasible, it will conduct appropriate competency proceedings, in accordance with this opinion. If after such proceedings the court finds that the hearing was not procedurally adequate and substantively acceptable, or that defendant proved he was incompetent, the trial court must set the case for a new trial. If it finds the hearing was adequate and defendant failed to prove he was incompetent, the trial court will reinstate the judgment.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Lightsey
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S048440
**Date Filed:** July 9, 2012
_____

**Court:** Superior
**County:** Kern
**Judge:** John I. Kelly

_____

**Counsel:**

Erik N. Larson and Manuel J. Baglanis, under appointments by the Supreme Court; Law Office of E. Michael Linscheid and E. Michael Linsheid for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Judy Kaida and Kari Ricci, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Erik N. Larson
Law Office of E. Michael Linscheid
345 Franklin Street
San Francisco, CA  94102
(415) 782-6002

Manuel J. Baglanis
Law Office of Manuel J. Baglanis
P. O. Box 70035
San Jose, CA  95170
(408) 446-3987

Kari Ricci
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 327-0306